UNITED STATES of America,
Plaintiff–Appellant,

v.

$67,220.00 IN UNITED STATES
CURRENCY, Defendant,

Robert N. Easterly, Jr.,
Claimant–Appellee.

No. 91–5645.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 31, 1992.

Decided Feb. 28, 1992.

D. Gregory Weddle, Asst. U.S. Atty. (argued and briefed), Jerry G. Cunningham, U.S. Atty., Office of U.S. Atty., Knoxville, Tenn., for plaintiff-appellant.

W. Thomas Dillard (briefed), Kenneth F. Irvine (argued), Ritchie, Fels & Dillard, Knoxville, Tenn., for claimant-appellee.

Before KENNEDY and GUY, Circuit Judges, and LIVELY, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

The government appeals the district court's grant of summary judgment to the claimant in this civil forfeiture action brought under 21 U.S.C. § 881. The district court found that the government had failed to establish probable cause to believe that the currency seized from the claimant was substantially connected to illegal drugs. We reverse and remand.

## I.

On March 9, 1990, the claimant, Robert Easterly, Jr., drove a borrowed truck to the Metropolitan Knoxville Airport to catch a Delta Airlines flight to Miami, Florida. Easterly, using his American Express card, had purchased a one-way ticket earlier in the day at the Delta office in downtown Knoxville. Easterly was casually dressed and carried a suitcase and camera bag as he approached the Delta ticket counter.

Lieutenant Kelly Camp, a plainclothes airport police officer, observed Easterly as he checked his suitcase at the ticket counter. Camp had never seen or heard of Easterly before that date. Camp noticed a rubber-banded stack of money protruding from one of Easterly's pockets and bulges in several other pockets. After learning from the ticket agent that Easterly had a one-way ticket to Miami, Camp followed Easterly toward the departure gate.

After Easterly had passed the airport metal detector, Camp overtook him, introduced himself, and asked to speak with him. Easterly agreed. Camp first asked to see Easterly's plane ticket. Easterly produced the ticket, and Camp observed that it was in the name "Robert Easterly." Camp then checked Easterly's driver's license and confirmed that the same name appeared on it. Easterly next agreed to let Camp search his camera bag. Camp found only toiletries and camera parts in the bag. At some point during this encounter, Camp used his radio to request backup.

Easterly then consented to a search of his person. Lt. Don Moore, a uniformed airport officer, arrived at the concourse as Camp searched Easterly. Camp found and removed five bundles of large denomination bills. Easterly told Camp that he was carrying about five thousand dollars.

Camp, holding the cash that he had removed, asked Easterly to accompany him to the police office in the airport. Easterly expressed concern about missing his flight, but agreed to accompany the officers. Easterly walked beside Camp while Moore walked behind. Upon arriving at the police office, the officers drew the blinds and closed the doors.

The officers then made a series of phone calls. They called Delta to have Easterly's suitcase pulled off of the flight, the Blount County Sheriff's Office to have a drug-sniffing dog brought to the airport, and Agent Lowell Miller of the Drug Enforcement Agency to request his presence.

While waiting for the arrival of the luggage, the dog, and Miller, Camp asked Easterly how much money he had and why he was carrying it. Easterly responded that he was carrying about $20,000 to buy jewelry in Florida. Camp then asked Easterly to consent to another search of his person. Camp found and removed several more bundles of cash from Easterly's waistband. The officers counted the money and arrived at a total of $67,220.

Easterly's suitcase arrived and the officers searched it. They found nothing unusual in it. Easterly then asked, for the first time, if he was free to leave. Camp told Easterly that he could leave but that he could not take the money with him. Easterly stayed.

A few minutes later, the dog arrived. The dog sniffed the money, the camera bag, and the suitcase. According to Moore, the dog sat after sniffing these items. The dog's handler told Camp and Moore that this was a positive reaction for drugs.

Next, Agent Miller arrived at the scene. After telling Camp to write Easterly a receipt for the money, Miller spoke with Easterly. Easterly told Miller that he had intended to go to Hollywood, Florida, to buy jewelry for Budget Gold, a business owned by Ira Grimes. Easterly explained that he worked for Grimes and that the $67,220 represented Budget Gold's profits for the previous four years. Miller asked Easterly where he was planning to buy jewelry in Hollywood. Miller later testified that he could not recall whether Easterly could not or would not answer that question.

Easterly then left the office with his suitcase, camera bag, and receipt. Moore accompanied Easterly to the borrowed truck in the parking lot. Easterly allowed Moore to search the truck, but the search revealed nothing other than a cigarette butt in the ashtray. Moore stated that he could not determine whether the butt came from a marijuana or tobacco cigarette. Easterly then left the airport.

The next day, Easterly told Grimes about the seizure. According to Grimes, Easterly confessed to taking $2,000 from Grimes' desk and removing Grimes' business license from his wall. Easterly explained

that he had borrowed most of the seized money from friends and relatives in order to buy jewelry. He told Grimes that he took his business license so that he would be able to make purchases wholesale and that he had planned to repay the $2,000 after turning a profit. Easterly asked him to vouch that the seized cash was Budget Gold's money so that Easterly could get it back. Grimes refused to help Easterly because only $2,000 of the cash was Budget Gold's money and because he was angry at Easterly for taking his money and business license.

The government instituted this forfeiture proceeding in October 1990. Easterly immediately filed a claim for the money. Camp, Moore, Miller, Easterly, and Grimes were all deposed one month later. Each of the five deponents testified to the events of March 9 and March 10. There were only minor discrepancies in the various accounts.

Miller, Easterly, and Grimes also testified to other matters. Miller stated that he had information that Easterly and Grimes were cocaine dealers, but refused to provide any basis for that statement on the ground that an investigation was continuing.

Grimes confirmed that Easterly had sold jewelry on a commission basis for Budget Gold for four years prior to the seizure. Grimes also stated that he was aware that there was a well-known jewelry flea market in the Miami area. Grimes stated that he usually bought jewelry through the mail or in Atlanta. Grimes testified that he had no knowledge of any illegal drug activity involving Easterly.

Easterly testified that he had borrowed most of the seized money from friends and relatives in order to set up his own jewelry business. Easterly provided the names of three persons he claimed had loaned him the bulk of the money. According to Easterly, the three had loaned him the cash without obtaining a note or receipt. Easterly confirmed that he had taken Grimes' business license and $2,000 from his desk without permission. He also provided the

name of a jewelry mart in Florida that he had planned to visit.

Easterly moved for summary judgment two months later. He argued that the seizure had violated his Fourth Amendment rights and that the government did not have the necessary probable cause required to sustain a forfeiture action. The district court agreed that the government's proof fell short of probable cause and granted the motion for summary judgment. The court ordered the government to return the money to Easterly, but stayed the order pending the outcome of this appeal.

## II.

The civil forfeiture provision of the Controlled Substances Act provides, in pertinent part:

> The following shall be subject to forfeiture to the United States and no property right shall exist in them:
>
> . . . .
>
> (6) All moneys ... furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys ... used or intended to be used to facilitate any violation of this subchapter....

21 U.S.C. § 881(a)(6).

The allocation of burdens in a forfeiture proceeding is provided by 19 U.S.C. § 1615, made applicable to forfeitures under the Controlled Substances Act by 21 U.S.C. § 881(d). "[T]he burden of proof shall lie upon [the] claimant ... *Provided,* That probable cause shall be first shown for the institution of such suit or action, to be judged of by the court...." 19 U.S.C. § 1615 (emphasis in original). To meet its burden, the government "must establish probable cause to believe that a substantial connection exists between the property to be forfeited and the illegal exchange of a controlled substance." *United States v. 526 Liscum Drive,* 866 F.2d 213, 216 (6th Cir.1989).[1]

**1.** Our statements of the government's burden have not been uniform. In *United States v. One*

■ "Probable cause means 'reasonable ground for belief of guilt, supported by less than *prima facie* proof but more than mere suspicion.'" *Id.* at 216 (citations omitted). Thus, in a subsection (a)(6) forfeiture proceeding, the government's burden is to establish a reasonable ground for belief, supported by more than mere suspicion, that there is a substantial connection between the seized money and an illegal drug transaction. *United States v. Four Million Two Hundred Fifty–Five Thousand,* 762 F.2d 895, 903 (11th Cir.1985), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986).

■ The aggregation of facts, each one insufficient standing alone, may suffice to meet the government's burden. *United States v. U.S. Currency, $83,310.78,* 851 F.2d 1231, 1235 (9th Cir.1988). To determine whether the information is sufficient, a court must "weigh not the individual layers but the 'laminated' total." *United States v. Nigro,* 727 F.2d 100, 104 (6th Cir.1984) (citation omitted).

■ The only issue on appeal is whether the government's evidence was sufficient to survive Easterly's motion for summary judgment.[2] The district court found that it was not. We review that determination *de novo. United States v. One 1985 Cadillac Seville,* 866 F.2d 1142, 1146 (9th Cir.1989).

■ The district court, holding that probable cause must be measured at the time of the seizure, did not consider evidence developed after the airport encounter. While that approach has been adopted by at least one other district court, *see United States v. All Monies in Account No. 29–0101–62,* 746 F.Supp. 1441, 1444 (D.Haw.1990), we adopt the approach taken by the Second Circuit and hold that a district court must assess probable cause at the time of the forfeiture hearing. *United States v. 4492 S. Livonia Rd.,* 889 F.2d 1258, 1268 (2d Cir.1989); *United States v. Banco Cafetero Panama,* 797 F.2d 1154, 1162 (2d Cir. 1986).

> Of course, the government cannot start a forfeiture proceeding in bad faith with wild allegations based on the hope that something will turn up to justify its suit.... Once a forfeiture proceeding is brought, if further evidence is legally obtained to justify the government's belief, there is no persuasive reason to bar its use.

*4492 S. Livonia Rd.,* 889 F.2d at 1268. Since we agree with this approach, we must examine the entire record, including evidence developed after the seizure, to determine whether Easterly was entitled to summary judgment on the probable cause issue.

■ In reviewing Easterly's summary judgment motion, we must view the facts in the light most favorable to the government, the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). In this case, the parties agree, except as to minor details, on the facts surrounding the seizure. The only real dispute is over the interpretation that should be applied to those facts.

The government argues that an aggregation of the facts supports a reasonable belief that Easterly's money was substantially connected to an illegal drug transaction. The facts relied upon by the govern-

---

*1984 Cadillac,* 888 F.2d 1133, 1135–36 (6th Cir. 1989), we declined to apply the "substantial connection" requirement to a forfeiture of a car under 21 U.S.C. § 881(a)(4). Instead, we held that the government need only meet the probable cause standard employed to test searches and seizures. *Id.* at 1135; *see also United States v. One 1985 Chevrolet Corvette,* 914 F.2d 804, 809 (6th Cir.1990). In *1984 Cadillac,* however, we recognized in dicta that the legislative history of subsection (a)(6) requires the use of the "substantial connection" burden in forfeiture actions against money. *Id.,* 888 F.2d at 1136.

2. Easterly argued in the district court that he and his property were *seized in violation of the* Fourth Amendment. The district court agreed, concluding that the initially consensual encounter became involuntary when Camp removed money from Easterly's person and asked him to go to the police office. However, the court stated that, since suppression of evidence is not at issue, a Fourth Amendment violation is irrelevant to the question of whether the government has probable cause to forfeit the money. Neither party raises any Fourth Amendment issues on this appeal.

ment can be grouped into five categories: (1) Easterly's destination and manner of travel; (2) Easterly's possession of a large sum of cash; (3) the reaction of a drug-sniffing dog; (4) Easterly's statements to the police; and (5) Easterly's alleged involvement in the drug trade. In order to consider the "laminated whole," we must include all probative evidence in the calculus. Therefore, we review each piece of evidence separately only to determine whether it is probative, not whether it establishes probable cause standing alone. *See United States v. Thomas*, 913 F.2d 1111, 1117 (4th Cir.1990).

First, the government points to the details of Easterly's travel. In particular, Easterly bought a one-way ticket to Miami, a well-known source city for drugs. Camp testified that Easterly looked over his shoulder repeatedly while checking his suitcase at the ticket counter. The government also suggests that Easterly arrived just before his flight was to depart so as to avoid extended surveillance.

We have held that air travel to and from Miami and nervousness at an airport, while innocent in themselves, may be considered in deciding whether the government has established probable cause. *United States v. Knox*, 839 F.2d 285, 290 (6th Cir.1988), *cert. denied*, 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989). Late arrival at the airport is also a probative fact. *Thomas*, 913 F.2d at 1116.

On the other side of the balance, however, are several factors that reduce the suspiciousness of Easterly's travel. He bought the ticket in advance with his American Express card, travelled under his own name, and checked luggage. *Cf. Knox*, 839 F.2d at 290 (tickets purchased with cash); *Thomas*, 913 F.2d at 1116 (ticket purchased with cash and no baggage checked); *United States v. $175,260*, 741 F.Supp. 45, 48 (E.D.N.Y.1990) (travelling under false name).

■ Second, the government points to the large amount of cash Easterly carried. Easterly correctly points out that no court has yet held that the presence of a large sum of cash is sufficient, standing alone, to establish probable cause for forfeiture. *See United States v. $38,000.00*, 816 F.2d 1538, 1548 (11th Cir.1987). However, carrying a large sum of cash is strong evidence of some relationship with illegal drugs. *United States v. $215,300*, 882 F.2d 417, 419 (9th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 3242, 111 L.Ed.2d 752 (1990).

The government also argues that the manner in which Easterly carried the money indicates an intent to conceal it. The evidence shows that Easterly stuffed the cash, in rubber-banded stacks, into his pockets and waistband. The fact that Camp could see cash protruding from Easterly's pockets suggests that Easterly did little to conceal his money. *Cf. U.S. Currency, $83,310.78*, 851 F.2d at 1235 (attempt to hide money behind door); *$215,300*, 882 F.2d at 418 (money hidden in socks and in apron taped to waist); *$175,260*, 741 F.Supp. at 47 (money gift-wrapped during Christmas season). On the other hand, the government plausibly suggests that Easterly carried the money on his person instead of in a satchel or briefcase so as to avoid detection by the x-ray device used to screen carry-on baggage.

■ Third, the government points to the alleged reaction of the drug-sniffing dog. The government argues that this evidence, standing alone, is sufficient to find probable cause. *$175,260*, 741 F.Supp. at 48; *see also $215,300*, 882 F.2d at 419 (canine alert to currency is strong evidence of illegal transaction).

We agree that a positive dog reaction is at least strong evidence of a connection to drugs. However, the government's evidence on this point is weak. For reasons that do not appear on the record, the government did not obtain testimony from the dog's handler or anyone else familiar with the performance or reliability of the dog. Therefore, there is no indication in the record as to the trustworthiness of this particular dog. This fact distinguishes this case from *$175,260* and *$215,300*, where testimony established the reliability of the dogs.

In fact, there is little probative evidence in the record that the dog actually alerted to Easterly's property. Camp and Moore both testified that they did not know that the dog had alerted until the handler told them so. According to Moore, the dog sat down after sniffing. Camp could not recall how the dog reacted.

While we must consider all of the government's evidence in order to determine whether probable cause was established, we must also consider the relative strengths and weaknesses of that evidence. We find the dog evidence in this case to be probative but weak.

■ Fourth, the government argues that Easterly's misstatements to the officers are probative. According to Camp, Easterly twice understated the amount of money he was carrying. Miller testified that Easterly told him that the money represented the profits of Budget Gold, a statement contradicted by Ira Grimes' testimony and later retracted by Easterly. We agree that Easterly's misstatements are probative of possible criminal activity. See $215,300, 882 F.2d at 419.

■ Fifth, the government points to Agent Miller's statement that he had reason to believe that Easterly had sold cocaine in the Knoxville area. A claimant's record of drug activity is a highly probative factor in the forfeiture calculus. See, e.g., U.S. Currency, $83,310.78, 851 F.2d at 1236 (holding that money carrier's arrest and conviction record is probative). However, we can attach no weight to Agent Miller's testimony because he refused to offer any basis for his belief that Easterly had sold drugs.[3]

■ Having examined each piece of evidence in isolation, we must now determine whether their aggregation amounts to probable cause to believe that the money was substantially connected to illegal drug transactions. The evidence shows that Easterly used a credit card to buy a one-way ticket to a drug source city, arrived late, appeared nervous, carried a large amount of cash in his pockets and waistband, lied about the amount and source of the money, and that a drug-sniffing dog may have alerted to Easterly's cash and luggage.

These facts are strikingly similar to the facts in $215,300. In that case, a police officer stopped a Miami-bound traveller at an airport after noticing currency protruding from a pocket. The visibly nervous traveller initially told the police that he was carrying only $15,000. A patdown search revealed an additional $201,000 in his socks and in an apron taped to his waist. The traveller told the police that he intended to use the money to buy gold and gems in Miami. A drug-sniffing dog alerted to the currency. The Ninth Circuit concluded that probable cause for forfeiture was established by the large sum of cash, the canine alert, the concealment of the money, the traveller's nervousness and untruthfulness, and his use of a ticket issued by a travel agency often used by drug dealers. $215,300, 882 F.2d at 419.

The only significant differences between this case and $215,300 are that Easterly did not use a travel agency frequented by drug dealers and that the government in this case did not establish the reliability of the dog. On the other hand, Easterly, unlike the traveller in $215,300, admittedly lied about the source as well as the amount of the money.

The issue is close, but we cannot agree with the district court that the government's case amounts to mere suspicion. As we have indicated, there are weaknesses in the government's evidence. However, viewing the evidence favorably to the government, as we must in reviewing summary judgment for Easterly, we conclude that the evidence supports a reasonable belief that the seized currency is substantially connected to illegal drug transactions.

**3.** We also observe that the government offered no evidence to contradict Easterly's statement that he has never been convicted of any crime.

Since we find that the government established probable cause, the burden now shifts to Easterly to prove "innocent ownership" of the seized money. *United States v. Currency $267,961.07*, 916 F.2d 1104, 1108 (6th Cir.1990). Easterly argues that he is entitled to summary judgment because the government failed to rebut the explanation he provided at his deposition. However, since Easterly bears the burden of proof on the innocent ownership issue, summary judgment on this issue is inappropriate unless the evidence "is so one-sided [that he] must prevail as a matter of law." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

Easterly testified that several persons loaned him the money that the government seized, but Easterly did not present their testimony. Easterly did not produce receipts or any other evidence of the loans. Easterly also testified that he intended to use the money to buy jewelry at a Florida flea market. Easterly presented no evidence to support his argument that carrying large amounts of cash was a commercially reasonable way to perform that transaction. Ira Grimes testified that he did not buy jewelry in that manner.

The evidence of Easterly's innocent ownership is not so one-sided as to entitle him to summary judgment. While Easterly may be able to prove his claim at trial, we hold that the depositions and pleadings do not establish the absence of a genuine issue of fact. Therefore, the trier of fact will have to determine whether Easterly is able to establish innocent ownership by a preponderance of the evidence.

We REVERSE the district court's grant of summary judgment to the claimant and REMAND for further proceedings consistent with this opinion.