9 F.3d 110
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
CERTAIN REAL PROPERTY LOCATED AT 21090 BOULDER CIRCLE,
NORTHVILLE, OAKLAND COUNTY, MICHIGAN, Together
With All Improvements, Fixtures, and
Appurtenances Thereon, Defendant;
Betty A. Hamilton, Claimant-Appellant.
 
 No. 92-1589.
 United States Court of Appeals, Sixth Circuit.
 Oct. 25, 1993.
 Before: KEITH, GUY, and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 Claimant-Appellant Betty A. Hamilton appeals the civil forfeiture of a house she bought for her parents. Forfeiture was ordered when she, having stipulated that probable cause existed to forfeit the house pursuant to 18 U.S.C. Sec. 981(a)(1), failed to prove that she qualified for the "innocent owner" defense of Sec. 981(a)(2). Finding no error, we affirm.
 
 
 2
 * A. Facts
 
 
 3
 Not including the undisputed facts in this matter, the trial produced two sets of facts: Betty's version and the government's version. Because both are necessary to an understanding of the dispute in this case, we give both versions.
 
 
 4
 The facts as stated by Betty and her witnesses at trial were as follows. In mid-1988, Betty decided to purchase a house for her parents, Mr. and Mrs. Badalucco. Anticipating that she would soon decide which house to purchase for her parents, Betty applied for and received a $100,000 loan from First of America Bank-Wayne on August 5, 1988. She immediately deposited the loan proceeds in her personal account at National Bank of Detroit. The loan was secured by a mortgage on a piece of commercial property she owned.
 
 
 5
 That evening, Betty's husband, John L. Hamilton, Sr., informed her that a close friend of his. William Glenn, had asked for a short-term loan of $70,000 in order to secure the performance of singer Julio Iglesias at an upcoming concert series that Glenn was promoting. John informed Glenn that he should speak to Betty about the possibility of a loan. Glenn called Betty, and Betty reluctantly agreed to make the loan on the condition that the money be returned by the end of August. Glenn assured her that she would have the money back in "a few days."
 
 
 6
 Betty then took a personal check, wrote the number "70,000" in the box for the amount of the check, signed the check, and gave it to her husband to deliver to Glenn. Betty explained that she left the other portions of the check for her husband to complete because (1) she was upset about agreeing to make the loan and (2) she was not sure whether the payee was to be Glenn or his company. On Saturday (the next day), John completed the check by writing in the date (August 6, 1988), by entering in longhand the amount of the check ("seventy thousand and no/100"), and by writing "personal loan" on the memo line. He then delivered the check to Glenn.
 
 
 7
 On Monday, August 8, John and Glenn met at a lounge/bar owned by Betty, and Glenn delivered to John $70,000 in cash. Instead of immediately depositing the cash in his wife's personal account, John split the money into bundles and arranged to have different people take it to the bank. John explained that he did this to reduce the risk of having one person take the full amount to the bank. That same day, several cashier's checks from several different banks were purchased with the cash:
 
 
 8
 -----------------------------------------------------------------------
-----------------------------------------------------------------------
Cashier's Check #Bank Purchaser Amount
-----------------------------------------------------------------------
853314011 First of America D. Wise $8,750
-----------------------------------------------------------------------
6406123 National Bank of Detroit Denise Wise $8,750
-----------------------------------------------------------------------
6406122 National Bank of Detroit John Hamilton[1] $8,750
-----------------------------------------------------------------------
853314574 First of America John Hamilton $8,650
-----------------------------------------------------------------------
6377855 National Bank of Detroit Billy R. Martin $8,750
-----------------------------------------------------------------------
581942 Michigan National Bill Martin $8,850
-----------------------------------------------------------------------
14637 First Dearborn Billy R. Martin $8,750
-----------------------------------------------------------------------
107514 Manufacturers Bill R. Martin $8,750
 
 
 9
 John Jr. turned over each of these checks to his father, and on August 16th, John gave them to his wife.[2] Betty totalled the amounts of the checks to confirm that the full $70,000 had been repaid, endorsed each check, and deposited them into her personal account. Betty testified that although she "thought it was odd" that she would get eight checks back instead of one, she did not think there was anything suspicious about the circumstances.
 
 
 10
 On September 7, 1988, Betty purchased a $100,000 condominium for her parents. The funds used for this purchase were from her personal account, the account into which the eight cashiers checks had been deposited.
 
 
 11
 The government's version of the facts was somewhat different. The government asserted that Betty knew all along that she was involved in a money laundering scheme and was violating the anti-structuring provisions of 31 U.S.C. Sec. 5324. The government argued that Betty knew that John would not give the $70,000 check to Glenn until after Glenn gave John the cash (that was to be laundered). Because the check was to be given in exchange for Glenn's delivery of the cash at some future date, Betty left the check mostly blank. This theory explained why Betty requested no written evidence of or security for the $70,000 "loan."
 
 
 12
 The government's theory also explained some of the other suspicious circumstances. The government brought out on cross-examination that Glenn had not yet deposited Betty's check (which he supposedly received on August 6) on August 8 when he delivered the cash to John; in fact, Glenn did not deposit the check until August 12. When government counsel asked why it took so long for Glenn to deposit a check that he needed so badly, Glenn explained that he forgot that he had not yet deposited it. When asked to explain why, instead of giving John $70,000 in currency, Glenn did not simply return Betty's check if he had not yet cashed it, Glenn again stated that he had forgotten that he had not yet deposited the check.
 
 B. Procedural History
 
 13
 On April 26, 1991, the United States brought this civil forfeiture action against the property purchased by Betty for her parents, certain real property known as 21090 Boulder Circle, Northville, Michigan. The complaint alleged that the property was forfeitable pursuant to 18 U.S.C. Sec. 981(a)(1) as property that was traceable to property involved in one or more "structuring" transactions, transactions intended to evade the currency reporting requirements of 31 U.S.C. Sec. 5313 in violation of 31 U.S.C. Sec. 5324.
 
 
 14
 Betty filed a verified claim as owner of the property sought to be forfeited, and after her motion for summary judgment was denied, the parties stipulated that probable cause existed to forfeit the property. The district court conducted a bench trial on the sole issue of Betty's affirmative defense that she was an "innocent owner" under 18 U.S.C. Sec. 981(a)(2). After a three-day bench trial, the district court held that Betty had failed to establish her claim of innocent ownership. The district court then ordered that the property be forfeited to the government to the extent of $70,000. This appeal followed.
 
 II
 A. Innocent Owner Defense
 
 15
 Because the parties stipulated that there was probable cause to forfeit Betty's interest in 21090 Boulder Circle to the extent of $70,000,[3] the only issue at trial was whether Betty was entitled to the "innocent owner" defense of 18 U.S.C. Sec. 981(a)(2), which provides:
 
 
 16
 No property shall be forfeited under this section to the extent of the interest of an owner or lienholder by reason of any act or omission established by that owner or lienholder to have been committed without the knowledge of that owner or lienholder.
 
 
 17
 The district court, in finding that Betty had not established her "innocent owner" status, relied on several facts. First, Betty was a sophisticated businesswoman who owned, among other things, a few lounge/bar establishments that dealt primarily in cash. Second, she had purchased a piece of property in 1987 for $50,000 using six checks, all of which were under $10,000.[4] Third, Betty admitted knowing that cash deposits over a certain amount were reported by the bank to the IRS. Fourth, the district court found the testimony of John Hamilton, Mr. Glenn, and Mr. Martin, to be completely unbelievable, and the court disregarded it entirely.[5] Finally, the court said, "I think [this] is a very heavy circumstantial case that shows that [Betty] knew exactly what was going on here." The court therefore held that Betty had failed to establish that she was entitled to the innocent owner defense.
 
 
 18
 Two legal requirements dictate the outcome in this case. First, Federal Rule of Civil Procedure 52(a) provides in part, "Findings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of [sic] the credibility of the witnesses." Second, Betty had the burden of proof on her innocent owner defense; the government did not have to disprove her innocence. See 18 U.S.C. Sec. 981(a)(2); cf. United States v. $67,220, 957 F.2d 280, 287 (6th Cir.1992) (construing innocent owner defense of 21 U.S.C. Sec. 881).
 
 
 19
 Betty first argues that the district court improperly based its decision on a facilitation-liability theory used in the context of violations of 18 U.S.C. Sec. 1956 and by so doing destroyed the availability of the innocent owner defense under 18 U.S.C. Sec. 981(a)(2).
 
 
 20
 Although the district court did describe the structuring transaction as a "money laundering operation," and did say that Betty "made the whole thing possible by receiving these checks," the court's opinion, read as a whole, does not miss the mark. The opinion is directed to whether Betty was an innocent owner and holds that, in light of her knowledge that a structured transaction occurred, she was not. The district court's occasional references to money laundering and facilitation do not undercut its findings on the innocent owner issue, and thus this argument fails.
 
 
 21
 Betty next contends that the district court's findings of fact are insufficient as to whether she knew about the structured transaction, because there was no evidence that Betty knew of the structured transaction at the time it took place. She argues that the language of Sec. 981(a)(2), "by reason of any act or omission established by that owner or lienholder to have been committed without the knowledge of that owner," means that if the illegal act (in this case the structured transaction on August 8th) occurred without her knowledge, she is entitled to the innocent owner defense. As her argument goes, since there was no evidence that she was present at the purchase of any of the eight cashier's checks or that she knew the transaction was happening that day, she was entitled to the innocent owner defense.
 
 
 22
 The government argues otherwise. It contends that "[t]he district court inferred that claimant did not request collateral for the loan or a security note because she knew Glenn already had the currency and she knew that her husband would not release her check to Glenn until Glenn had given her husband the $70,000 in currency."
 
 
 23
 We believe the government is correct. The court's opinion, though not addressing the specific timing of Betty's knowledge, implicitly holds that she knew beforehand that Glenn and John were going to conduct a structured transaction and would pay her back with cashier's checks from that transaction. This finding of fact is not clearly erroneous and we therefore reject Betty's second contention.[6]
 
 
 24
 Finally, Betty contends that the district court clearly erred in its factual finding that receipt of the eight cashier's checks was sufficient to establish knowledge of the illegal transaction. Betty focuses on the lack of evidence that she knew that whatever transaction had produced the eight cashier's checks was illegal and points to several facts: (1) she testified that she did not know what dollar amount of currency required the filing of the Currency Transaction Reports, (2) it was not plain from the face of the cashier's checks that they were purchased with cash, (3) whatever knowledge she did have of the Treasury Department's reporting requirements, that knowledge was certainly not enough to know that this transaction was illegal, and (4) she had no duty to investigate the legality of the transaction.
 
 
 25
 We need not decide whether a claimant's lack of knowledge of the illegal nature of the transaction requires that the claimant be given the innocent owner defense,[7] because the district court in this case found that Betty "knew exactly what was going on here" and was not persuaded that she lacked guilty knowledge of the nature of the transaction. We do not deny that there was some evidence that Betty did not even know that a structuring transaction had occurred. Because it was not noted on the cashier's checks that the checks were purchased with currency, Betty could have believed that each check had been purchased with another check, and in such a circumstance, the transaction would not have been a structured one. But the district court's finding that Betty "knew exactly what was going on here" is not clearly erroneous. As noted above, there was evidence that Betty was a sophisticated businesswoman with knowledge of the currency transaction reporting requirements and had even engaged in a prior transaction that was somewhat similar. Because we are not left with a "definite and firm conviction that a mistake has been committed," United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948), we cannot say the district court's finding is clearly erroneous.
 
 B. Other Acts Evidence--Fed.R.Evid. 404(b)
 
 26
 Betty also asserts that there was reversible error with regard to the district court's admission of certain evidence under Federal Rule of Evidence 404(b). At trial, the court admitted, over objection, evidence that Betty and John had purchased a piece of real estate in 1987 for $50,000 using six checks, each under $10,000. Betty and John explained that the property was purchased that way because certain debts, each under $10,000, had been repaid at the same time, so they simply took those payments, converted them to cashier's checks, and used them to pay the seller of the property.
 
 
 27
 The Sixth Circuit, sitting en banc, recently clarified the standard of review of a district court's Rule 404(b) determination:
 
 
 28
 Although this court has frequently stated that we review 404(b) evidence under an abuse of discretion standard, we believe it is more precise to state the following. First, it must be determined as a matter of preliminary fact whether there is sufficient evidence that the prior act occurred. Second, a legal determination must be made whether the "other act" allegedly committed by the defendant was admissible as evidence of "intent, preparation, [or] plan."
 
 
 29
 United States v. Gessa, 971 F.2d 1257, 1261 (6th Cir.1992) (en banc); see also Fed.R.Evid. 404(b) ("Evidence of other crimes, wrongs, or acts ... may ... be admissible [to prove] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...."). The 404(b) evidence must also be "substantially similar and reasonably near in time" to the transaction at issue. See United States v. Feinman, 930 F.2d 495, 499 (6th Cir.1991). Here, Betty does not contend that the 1987 transaction never occurred, but that the act was not sufficiently analogous to the case at bar because it was not actually a structured transaction, having not involved the physical transfer of currency.
 
 
 30
 We believe the 1987 transaction was sufficiently similar as to be admissible for the following purpose: to refute claims of mistake, inadvertency, or lack of knowledge as to the structured nature of the transaction at issue. The 1987 transaction involved six cashier's checks, purchased by two different people, all on the same date, all from different banks, some purchased with cash, and all less than $10,000. The similarities between the 1987 and 1988 transactions are sufficient to establish the relevance of this evidence, and the dissimilarities do not detract so much from the weight of the evidence as to make it inadmissible. The district court acted within its discretion in admitting the evidence of a prior similar transaction to rebut Betty's contention that she was an innocent party to this structuring scheme.
 
 III
 
 31
 For the foregoing reasons, the order forfeiting claimant's property to the extent of $70,000 is AFFIRMED.
 
 
 
 [1]
 John, Jr. is the purchaser identified here and on the following check
 
 
 [2]
 John testified that he did not give the checks to his wife sooner because (1) he forgot to tell her that Glenn had paid the money back, and (2) he was gone for a few days on a trip to Las Vegas
 
 
 [3]
 The probable cause finding was based on a violation of 18 U.S.C. Sec. 981(a)(1), which provides in part
 (a)(1) Except as provided in paragraph (2) [the paragraph establishing the "innocent owner" defense], the following property is subject to forfeiture to the United States:
 (A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section 5313(a) or 5324(a) of title 31, or of section 1956 or 1957 of this title, or any property traceable to such property.
 Title 31 U.S.C. Sec. 5313(a), in conjunction with federal regulations, requires that financial institutions report cash transactions of over $10,000 on IRS Form 4789 ("Currency Transaction Report"). Title 31 U.S.C. Sec. 5324(a) prohibits the structuring of a transaction for the purpose of evading the reporting requirements of Sec. 5313(a). The parties stipulated that there was probable cause to believe (and the district court found as a matter of fact) that the eight-check transaction was an illegally structured transaction.
 
 
 [4]
 The admissibility of this evidence is discussed in part II.B
 
 
 [5]
 The court said, "I want to comment just for a minute, if I may, upon the testimony of John Hamilton, Mr. Glenn and Mr. Martin, all of whom testified on behalf of the claimant. Their testimony is totally unbelievable and I state unequivocally that not one of them is worthy of belief. I have been on the Bench 35 years and seldom have I seen such liars as those three people were. I am just going to disregard their testimony."
 
 
 [6]
 In light of our ruling on this issue, we do not reach the question whether knowledge of the illegal transaction must be gained before that transaction in order to defeat the innocent owner defense
 
 
 [7]
 We note, however, that this particular argument was rejected in United States v. 316 Units of Mun. Sec., 725 F.Supp. 172 (S.D.N.Y.1989):
 ... Claimants argue that "innocent owner" refers to lack of knowledge of the transactions' illegality. The government contends that "innocent owner" refers to lack of knowledge of the illegal transactions. Insofar as actual knowledge of the anti-structuring statute is not a required element for purposes of civil forfeiture, the Court agrees with the government. To hold otherwise would distort the anti-structuring statute as discussed earlier.
 ....
 ... [The innocent owner defense] requires only a showing of ignorance of the illegal transactions. Indeed, claimants' notice of motion states that Sec. 981(a)(2) provides that "there can be no forfeiture if the owner establishes that the acts complained of were committed without the knowledge of that owner" (emphasis added).
 Id. at 180 (footnote omitted). Therefore, even if Betty had in fact lacked knowledge that the eight-check transaction was illegal, we might hold this immaterial; under 316 Units, it was enough that she knew that the transaction had occurred.