enforcement of Wyoming property rights was not a central concern under the federal land-grant statutes. *See id.* at 25–26, 103 S.Ct. 2841.

 Similarly, a coercive action brought by Union Pacific to enforce its rights under the federal land-grant statues would fall outside of 28 U.S.C. § 1331. As the Supreme Court noted in *Townsend,* " 'whatever incidents or rights attach to the ownership of property conveyed by the government will be determined by the states, subject to the condition that their rules do not impair the efficacy of the grants or the use and enjoyment of the property by the grantee.' " 190 U.S. at 270–71, 23 S.Ct. 671. Thus, because Union Pacific's rights incident to its ownership of federally-granted rights-of-way must be determined under state law, any "coercive action" brought by Union Pacific to enforce its rights would fall outside of 28 U.S.C. § 1331's jurisdictional grant, since the federal land-grant statutes contain no evidence of congressional intent to provide a federal forum. *See Merrell Dow,* 478 U.S. at 814, 106 S.Ct. 3229.

e. *Plaintiffs' requests for injunctive relief*

Finally, we briefly consider plaintiffs' respective requests for injunctive relief. Nicodemus requested a permanent injunction "ordering Union Pacific to cease offering, negotiating, or undertaking leases, licenses, sales, or other conveyances of any claimed interest in the [plaintiffs'] lands," and the Morris plaintiffs requested "an injunction that requires Union Pacific to remove the trespassing fiber optical telecommunications cables."

 Here, plaintiffs sought injunctive relief in order to protect rights granted under Wyoming property and tort law. Because the requested injunctions would protect *state-created rights,*[13] and since the federal land-grant statutes at issue lack any evidence of congressional intent to provide a federal forum, we have no jurisdiction under 28 U.S.C. § 1331 to consider these claims. *See Merrell Dow,* 478 U.S. at 808, 106 S.Ct. 3229; *Morris,* 39 F.3d at 1111.

### III. Conclusion

The district court properly held that it lacked subject-matter jurisdiction under 28 U.S.C. § 1331. Accordingly, we AFFIRM.

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**$242,484.00, Defendant,**

**Deborah Stanford, individually and as President, Director, and Stockholder of Mike's Import & Exports, U.S.A., a Florida corporation, Claimant–Appellant.**

**No. 01–16485.**

United States Court of Appeals, Eleventh Circuit.

Jan. 22, 2003.

---

Douglas L. Williams, Miami, FL, for Stanford.

Jeanne Marie Mullenhoff, Anne R. Schultz, Madeleine R. Shirley, Miami, FL, for United States.

Before EDMONDSON, Chief Judge, ANDERSON, Circuit Judge, and POGUE *, Judge.

EDMONDSON, Chief Judge:

This appeal arises out of a civil forfeiture action pursuant to 21 U.S.C. § 881(a)(6) which provides for the forfeiture of money linked to drug crimes.[1] The district court ordered the forfeiture of $242,484.00 seized from the claimant, Deborah Stanford. Stanford argues that the Government lacked probable cause to sup-

---

* Honorable Donald C. Pogue, Judge, United States Court of International Trade, sitting by designation.

1. 21 U.S.C. § 881(a) provides:
 The following shall be subject to forfeiture to the United States and no property right shall exist in them: [ ](6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

port forfeiture of the defendant currency. Because we conclude insufficient evidence supports the finding of probable cause, we reverse the forfeiture order.[2]

## BACKGROUND

Deborah Stanford is an American citizen who was born in Surinam, South America, and lives in Miami. She is the owner and president of Mike's Import & Export U.S.A., Inc. (Mike's). Mike's buys electronics, household and automotive goods and exports the items to South America.

In December 1998, Stanford was in New York City. She says that she was there to meet with her lawyer about a lawsuit involving a 1988 car accident. While in New York, she says that she was contacted by her brother and told to pick up some money for Mike's. The cash money was delivered to her by Surinamese people whom she says she did not know. Upon receipt of the money, Stanford counted it, separated it by denomination, and wrapped it in black plastic and a Christmas bag.

On 14 December, Stanford flew from New York to Miami. Security at John F. Kennedy Airport (JFK) questioned her about the packages. She told them that the packages contained money. Security allowed her to board her flight but notified the Drug Enforcement Administration (DEA) that a woman carrying a large amount of cash was traveling to Miami.

Believing that Stanford might be a currency courier for a drug organization, six Miami DEA agents, in three teams of two, went to the gate where Stanford's flight was scheduled to arrive. One team stayed close to the gate, another team stayed near the middle of the concourse, and the third stayed near the exit of the concourse. The agents were in plain clothes.

Agent Kenneth Miles saw Stanford as she walked out of the jet-way. He and Agent John Johnson approached her and identified themselves as DEA agents. Agent Miles testified that he explained to Stanford that part of his job was to ask people for their help in fighting the drug flow at the airport.

At the agent's request, Stanford gave them her ticket and identification. They verified her name and returned the items. The agents asked her if she was carrying drugs or money, and she said she was carrying about $200,000 cash in her backpack.

Agent Miles, with Stanford's permission, looked into the backpack and saw a "Christmas bag type package." He poked a hole in the bag and could see bundles of cash inside. The cash was bundled by denomination. The bundles were not of uniform size and did not bear the binding of a bank or financial institution. The Agents asked Stanford to accompany them to the DEA office, and she agreed.

At the office, Agent Miles asked Stanford why she was in New York. She said she was there because of her court case, but later said she was there to pick up money. Stanford could not, or would not, identify where she stayed in New York or who gave her the cash other then to say

---

2. Stanford also argues that the stop conducted at the Miami Airport was an unreasonable seizure in violation of the Fourth Amendment and that the district court erred by saying that Mike's Import & Export U.S.A., Inc. lacked standing to contest the forfeiture. "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the ne- cessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 108 S.Ct. 1319, 1323, 99 L.Ed.2d 534 (1988). Because we conclude that the Government cannot establish probable cause even with the evidence obtained from the stop, we avoid the Fourth Amendment issue. Because Mike's filed no claim, the district court correctly determined that it lacked standing.

(according to Agent Miles) that she was called by her brother who told her to meet some people and pick up money for Mike's. She did not produce documentation connecting the currency to Mike's. When asked for the total amount of the cash, Stanford said that one bundle contained $79,900 and the other $162,750; a total of $242,650.

"Rambo," a narcotics-detecting dog, was brought into the room. Stanford's backpack was placed in a hallway with other packages of similar size and shape. Rambo alerted on Stanford's backpack.[3] After the dog alert, Agent Miles prepared a receipt for the currency and gave the receipt to Stanford as confirmation of the seizure.

Stanford took the receipt and left the office. The agents packed the money inside an evidence box. On 15 December, the agents took the cash to SunTrust Bank and exchanged it for a cashier's check. The bank counted the cash, determined that there was a total of $242,484 and issued a check for that amount.

A follow-up investigation revealed that, in Miami, Stanford had purchased a 93 dollar round-trip airline ticket with cash; but did not board the return flight and subsequently changed her return date twice. No evidence in the record indicates that Stanford had a history of involvement in drug crimes, and she was charged with no crimes on account of these events.

## DISCUSSION

Stanford argues that the Government has made no showing of a connection between the money and controlled substances that rises above simple suspicion. We will consider all the evidence to determine whether the Government has met its burden of establishing "probable cause for belief that a substantial connection exists between the property to be forfeited and the criminal activity defined by the statute." *United States v. $4,255,625.39*, 762 F.2d 895, 903 (11th Cir.1985) (quoting *United States v. $364,960 in U.S. Currency*, 661 F.2d 319, 323 (5th Cir. Unit B 1981))(emphasis omitted).[4] " 'Probable cause' refers to 'reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion.' " *Id.* (quoting *United States v. One 1978 Chevrolet Impala*, 614 F.2d 983, 984 (5th Cir.1980)). In this case, we stress that, because the forfeiture is pursuant to 21 U.S.C. § 881(a)(6), not just any criminal activity will support the forfeiture: the form of criminal wrongdoing must involve "the exchange of a controlled substance." *Id.*

---

3. The testimony on this alert is in conflict. Agent Miles testified Rambo was an aggressive alerting dog and that he observed Rambo scratch at the bag. Rambo's handler, Officer Pedro Perez, testified Rambo alerted by sitting in front of the bag and did not scratch it.

4. The Government has not questioned the right of Stanford, on appeal, to challenge— that is, to seek reversal on—the district court's probable cause determination even though she, at the close of the Government's case went on to introduce evidence of her own. We know that, in some arguably similar instances, the appeal of preliminary decisions of sufficiency are barred if the defendant decides to present evidence after the other party rests. *See generally, United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *United States v. Alejandro*, 118 F.3d 1518, 1520–21 (11th Cir.1997). Because of the way this case has been briefed and argued, we have no dispute before us about claimant's right to challenge the probable-cause finding; and we decide nothing about that potential issue. *See generally, United States v. A Single Family Residence and Real Property Located at 900 Rio Vista Blvd., Ft. Lauderdale*, 803 F.2d 625, 628 (11th Cir. 1986).

"[T]he probable cause inquiry is a flexible one in which the court must consider the 'totality of the circumstances.'" *United States v. $121,100.00 in U.S. Currency*, 999 F.2d 1503, 1506 (11th Cir.1993). When reviewing a forfeiture order we accept the district court's fact findings unless clearly erroneous. *United States v. $149,442.43 in U.S. Currency*, 965 F.2d 868, 876 (10th Cir.1992). Whether the facts as found by the district court are sufficient to establish probable cause is a question of law which we review *de novo*. *See $121,100.00*, 999 F.2d at 1507.

■ The district court relied on these circumstances to support its finding of probable cause: (1) "the quantity of cash and its physical condition"; (2) "the route and circumstances surrounding Ms. Stanford's travel"; (3) "Ms. Stanford's lack of knowledge concerning the circumstances surrounding her trip to New York and the receipt of this money, including her inability to identify from whom she received it"; (4) "that Ms. Stanford twice was a 'no show' for her scheduled departure from New York to Miami"; and (5) a narcotics dog alerted on the cash.[5] None of these things standing alone is sufficient to establish probable cause. Always keeping in mind that probable cause is a totality-of-the-circumstances test, we will consider each element in turn to determine how much weight, if any, should be assessed to it as part of the whole.

■ Carrying a large amount of cash can indicate criminal activity. But it is not illegal to transport money this way. A large amount of cash does not—alone—satisfy the Government's burden to show probable cause. *$121,100.00*, 999 F.2d at 1506.

The manner in which the currency was bundled indicates that it did not come directly from a bank; and we suppose it could indicate some kind of illegal source, but it does not necessarily indicate a connection to drugs. The money, much of which was small bills, was packaged in bundles according to denomination. The currency bundles were wrapped in rubber bands and stowed inside two larger packages, one "Christmas bag type package" and one brown shopping bag inside a black plastic or cellophane wrapping. The evidence presented in support of probable cause need not "point to drugs to the exclusion of all other theories." *$121,100.00*, 999 F.2d at 1508. But the Government must ultimately make a connection between the seized money and an illegal narcotics transaction; and the way the money was bundled, while possibly consistent with some criminal activity, does not assist in making that connection.

That the currency was wrapped to conceal its presence counts for little. While we understand that a currency courier for a drug organization would attempt to conceal the money, we accept that anyone

---

**5.** The Government also asks us to consider the Narcotics And Dangerous Drug Information System (NADDIS) report (indicating that Mike's might be a front for money laundering) and Stanford's changing of her story while talking to the police. The district court said that the NADDIS report had slight relevance: but because of credibility issues "its value in the probable cause case is negligible." We agree that this particular report is worth very little in the probable cause analysis. Stanford's changing of her story strikes us as potentially more significant. But, while

the agents testified to this change, we note that the district court did not mention it in its statement of facts and only slightly alluded to it in the probable cause analysis. Again, while it is appropriate to consider a changing story, it does not carry much weight here. Stanford continually stated that she was in New York for her lawsuit. At one point during the course of an interview lasting between two and three hours, the agents claim she said that she was there to pick up money; this evidence does not compel a finding of intentional deception.

traveling with a large amount of currency would try to conceal it for safety reasons. As Agent Johnson testified, someone identified as having a large amount of currency could be robbed or killed. Stanford never hid that she was carrying currency from the authorities; when asked, she told both JFK Security and the DEA agents that she was carrying cash. Had Stanford actively attempted to conceal the money from the authorities, the wrapping might be of more influence. But in this case, we cannot say that the currency being wrapped to conceal its presence indicates a connection to narcotics transactions as required by the statute.

We recognize that travel from New York to Miami is an appropriate element to consider. Miami is a known center for drug smuggling and money laundering. *$4,255,625.39,* 762 F.2d at 904. Travel between source cities is circumstantial evidence of a possible connection between the money seized and narcotics transactions. *Id.* Combined with other circumstantial evidence, travel between these cities may be sufficient to establish probable cause. *Id.* But when combined with only other weak circumstantial evidence—as here—the "source city" element fails to draw a substantial connection to an illegal narcotics transaction.

We should consider that Stanford purchased her ticket with cash. Business travelers often purchase airline tickets with credit cards or checks while drug couriers often do not. And this circumstance is an appropriate consideration when evaluating probable cause in the totality. *$121,100.00,* 999 F.2d at 1507 (citing *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989)). But Stanford's ticket only cost 93 dollars; given the low dollar amount of this ticket, it hardly seems unusual that she paid cash. *Cf. Sokolow,* 109 S.Ct. at 1586 (paying $2,100 cash for two airline tickets from roll

of $20 bills is out of the ordinary). We also consider, but place little weight on, the fact that Stanford once "no showed" for her return flight and twice changed her return itinerary. We accept that large drug transactions are often delayed, forcing couriers to delay their travel. But many travelers delay their flights for legitimate reasons. The connection between the money and an exchange of controlled substances is not substantiated by the method Stanford used to pay for her airline ticket or the alteration of her travel arrangements.

■ Somewhat troubling is the fact that Stanford could not identify from whom she received the money and could not provide business receipts for the money. These circumstances are suspicious; but under the law, a claimant is under no duty to show that "the property derived from a legitimate source" until the Government first can establish probable cause of a substantial connection to a controlled-substance transaction. *$121,100.00,* 999 F.2d at 1505. Allowing the Government to base probable cause on the failure to identify a legitimate source of the currency unlawfully reverses this burden. Stanford's failure to identify the people who gave her the currency and to provide receipts is relevant to her ability to show a legitimate source or innocent ownership, but she is not required to make this showing until the Government establishes probable cause. *Id.*

Also troubling is Stanford's inability or unwillingness to state where she stayed in New York. Evasive answers are suspicious and add to the Government's case for probable cause. *See generally $121,100.00,* 999 F.2d at 1508 (citing nervousness when being questioned as an appropriate consideration). Evasiveness is circumstantial evidence of possible criminal activity and may be considered. *See $4,255,625.39,* 762

F.2d at 904. But in the totality of the circumstances of this case, we cannot say that, even with the evidence of evasiveness, probable cause exists to believe a substantial connection existed between the seized currency and a narcotics transaction.

We agree with the district court that "[t]he narcotics-detection dog's alert to the currency is also worth noting, although perhaps worth little else." The probative value of dog alerts to the smell of narcotics on currency has been called into question of late. *See United States v. $506,231 in U.S. Currency,* 125 F.3d 442, 453 (7th Cir. 1997); *United States v. $53,082.00 in U.S. Currency,* 985 F.2d 245, 250 n. 5 (6th Cir.1993). Testimony indicated that as much as 80% of money in circulation may carry residue of narcotics.[6] Officer Perez, Rambo's handler, testified that he did not know how long a scent of narcotics would remain on currency. The value of this dog alert is further degraded by the conflicting testimony about the dog's reaction to Stanford's currency. The dog alert, at best, tells us that this currency (like most circulated currency) may have been exposed, at some point, to narcotics. When combined with more compelling evidence of a connection to a narcotics transaction, this kind of dog alert may be probative; but it adds very little in this case.

Courts exist largely to draw lines. When Courts are called on to declare the legal consequences of a set of facts, the Courts are called on to draw lines in which cases may be near each other but, still, on opposite sides. In this case, we have an American citizen with no criminal record (traveling under her own name openly, on a public carrier) who has never denied that she was carrying a large amount of cash. In support of probable cause, the Government points to the large amount of currency, the fact that it was wrapped in black plastic and a Christmas bag, the travel between source cities and the dog alert. The elements relied upon by the Government indicate a possible connection to crime, perhaps, even to drug crime. But, it is a weak indication, at best. This weak indication of crime falls short of showing a "substantial connection" between the funds at issue here and a narcotics transaction. More than suspicion is necessary. This record is not enough to justify separating Ms. Stanford from her property.

We are unaware of a case finding probable cause on a record this thin. At trial, when the district court asked for the best Eleventh Circuit case, the Government cited *United States v. Carrell,* 252 F.3d 1193 (11th Cir.2001). When we asked for the best case at oral argument, the Government cited *United States v. $67,220.00 in U.S. Currency,* 957 F.2d 280 (6th Cir. 1992). Both cases present facts significantly more compelling than those presented here.

The claimant in *$67,200.00,* Robert Easterly, lied to the Government about the money he was carrying. *$67,220.00,* 957 F.2d at 286. He initially falsely told the Government that he was carrying "about five thousand dollars," and he later falsely said he was carrying "about $20,000." *Id.* at 281. He told the Government that the money had come from his business and asked his boss to lie to the investigators and "vouch that the seized cash was Budget Gold's money so that Easterly could get it back." *Id.* at 283. Here, the evidence indicates that Stanford has not engaged in this kind of deception. She never denied that she was carrying cash, and her statements about the amount of cash, while

---

**6.** We believe it somewhat ironic that, the day after the seizure, the DEA exchanged this drug-tainted currency for a cashier's check at SunTrust Bank, where the currency was possibly placed back into circulation for innocent people to possess.

not accurate to the penny, were a close and reasonable approximation of the actual dollar amount. No evidence suggests that she asked anyone to lie for her. This case is not comparable to *$67,220.00*.

This case is not comparable to *Carrell* either. In *Carrell*, the Government was able to trace the forfeited property directly to the proceeds of illegal drug sales. *Carrell*, 252 F.3d at 1201.

> [T]he government demonstrated probable cause that the first property titled in Scottie Carrell's name was purchased with the proceeds of Homer Carrell's marijuana and cocaine sales because he had no other legitimate source of income. Regarding the second property, the government's investigation revealed that the sixteen cars that belonged to Homer Carrell's mother that were exchanged for the property were purchased with Homer Carrell's drug proceeds.

*Id.* The court, in *Carrell*, concluded there was "ample evidence" of a substantial connection between the forfeited property and the marijuana and cocaine sales of Homer Carrell. *Id.* at 1202. In this case, the Government has offered no evidence that directly connects Stanford's money to illegal drug transactions. While this lack of direct evidence does not necessarily mean forfeiture is inappropriate, it does mean that *Carrell* is not instructive.

The closest cases finding probable cause that we know about are *$121,100.00*, and *$4,255,625.39*. This case, however, is considerably weaker than either of those cases. *$121,100.00* involved a person with a history of narcotics convictions, traveling under a false name, who purchased an

expensive airline ticket with cash, was carrying a large sum of money to which a dog alerted, and planned only a single-day trip. *$121,100.00*, 999 F.2d at 1507–08. The *$121,100.00* court indicated that the prior narcotics convictions were critical to its probable-cause determination. *Id.* Stanford's case is somewhat similar; but she did not travel under a false name, she purchased an inexpensive airline ticket and, very important, no evidence was presented that she had a history of involvement in drug transactions.

*$4,255,625.39* involved a much greater amount of money, over seven million dollars. *$4,255,625.39*, 762 F.2d at 902. Probable cause, in *$4,255,625.39*, was based on an eight-month-long series of transactions involving over two-hundred-and-forty-two million dollars. *Id.* In addition to the amount of money, the *$4,255,625.39* court pointed to nine elements supporting probable cause, only three of which are arguably present here. *Id.* at 903.[7] Of the *$4,255,625.39* elements that are not present here, we believe these are particularly significant: (1) on at least one occasion, the cash was delivered in the trunk of a car equipped with secret compartments that was abandoned when the couriers were followed, (2) the bank charged an unusually high service fee for the claimant's account, and (3) the claimant requested an "unusual" loan to protect the funds in the event they were subject to forfeiture. *Id.* at 903. Furthermore, the claimant believed that "perhaps he was dealing with people who were ... involved in the drug business." *Id.* at 899. We recognize that the present case involves elements, such as the dog alert, that were absent in

---

7. The *$4,255,625.39* elements that are arguably present here are (1) "the money was delivered ... by Colombian couriers, many of whom were unidentified," (2) "the couriers did not request, ... [or] refused to accept, receipts for the cash" and (3) "the cash con-

sisted of small and medium denomination bills." *$4,255,625.39*, 762 F.2d at 903. The elements are not identical (for example, Columbian as opposed to Surinamese couriers), but they are similar to the elements here.

*$4,255,625.39.* But, in our view, *$4,255,625.39* was a much stronger case; and we cannot say that it supports a finding of probable cause here.

As Justice Holmes noted, "[i]t sometimes is difficult to fix boundary stones between the private right of property and the police power when, as in the case at bar, we know of few decisions that are very much in point." *Hudson County Water Co. v. McCarter,* 209 U.S. 349, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908). But as Justice Holmes also noted, "[n]either are we troubled by the question where to draw the line. That is the question in pretty much everything worth arguing in the law." *Irwin v. Gavit,* 268 U.S. 161, 45 S.Ct. 475, 476, 69 L.Ed. 897 (1925). Given the weakness of the elements presented, and the complete lack of evidence connecting the seized money directly to illegal narcotics, the Government's case falls short of the probable-cause line. This citizen can keep her property.

REVERSED with instructions to enter judgment for Claimant.

POGUE, Judge, concurs in the result.