UNITED STATES of America,
Plaintiff,

v.

ONE PARCEL OF REAL ESTATE LOCATED AT 1948 MARTIN LUTHER KING DRIVE, SPRINGFIELD, ILLINOIS, et al., Defendants.

No. 97–3022.

United States District Court,
C.D. Illinois,
Springfield Division.

March 28, 2000.

Esteban F Sanchez, U.S. Atty, Springfield, IL, for plaintiff.

Bruce D Locher, Springfield, IL, for defendants.

Ralph E Williams, Springfield, IL, for JB Logan, claimant.

JB Logan, Springfield, IL, pro se.

W Scott Hanken, Rabin Myers & Hanken PC, Springfield, IL, for Cleveland Logan, claimant.

Cleveland Logan, Springfield, IL, pro se.

James E Elmore, Elmore & Reid, Springfield, IL, for Prince Ella Logan, claimant.

Prince Ella Logan, Springfield, IL, pro se.

Bruce D Locher, George AM Heroux, George AM Heroux, Springfield, IL, for Marvin Logan, claimant.

Marvin Logan, Springfield, IL, pro se.

Marcus Kyle Rominger, Giffin Winning Cohen & Bodewes PC, Springfield, IL, for Magna Bank fka Magna Bank of Springfield, claimant.

Rhonda Davis, Springfield, IL, pro se.

LaDonna S Robinson–Champion, Springfield, IL, pro se.

Shawnika Champion, Springfield, IL, pro se.

## OPINION

RICHARD MILLS, District Judge.

Melvin Logan was not very creative in laundering the mountain of drug money that he accumulated during his career as a drug dealer.

He placed hundreds of thousands of dollars in property in the names of his immediate family members, perhaps thinking that no one would notice that at the very same time that he is accumulating hordes of cash from drug sales, his family members suddenly decided to become real estate tycoons. Perhaps he also thought that no one would notice that the properties so acquired would be bought with unusually large amounts of cash or paid off quickly with large cash payments.

He was wrong.

The bench trial has been concluded and written closing arguments have been filed by the parties.

This order incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

Melvin Logan is not a party to this proceeding, but the case is based in large part on his illegal drug dealing and money laundering career that spanned more than a decade, from the early–1980s to the mid–1990s. This is a civil forfeiture case, in which the Government seeks the forfeiture of the properties—or at least some of the properties—that Melvin Logan bought with his drug proceeds or that were used to facilitate the drug transactions. After Counts 5, 13, 25, 26 and 31 were dismissed, the case proceeded to a lengthy bench trial on the remaining twenty six counts of the amended complaint. The Government seeks to forfeit the following real and personal properties:

A. Real property:

1. 1948 Martin Luther King Drive, Springfield, IL — (Count 1)
2. 2037 East Cedar, Springfield, IL — (Count 2)
3. 2041 East Cedar, Springfield, IL — (Count 3)
4. 2045 East Cedar, Springfield, IL — (Count 4)
5. 1955 South 19th Street, Springfield, IL — (Count 6)
6. 1209 East Laurel, Springfield, IL — (Count 7)
10. 2038 South Grand Ave. East, Springfield, IL — (Count 8)
11. 2246 East Cedar — (Count 9)
12. 2248 East Cedar — (Count 10)
13. 2250 East Cedar — (Count 11)
14. 2420 Wembley, Springfield, IL — (Count 12)
12. 1825 South Martin Luther King, Springfield, IL — (Count 14)
13. 1820 Spruce — (Count 15)
14. 2237 East Cedar, Springfield, IL — (Count 16)
15. 2240 East Cedar, Springfield, IL — (Count 17)
16. 1004 South 13th Street, Springfield, IL — (Count 18)

In addition to these real properties, the Government seeks forfeiture of the following personal properties:

B. Personal properties

1. 1988 Honda Goldwing Motorcycle — (Count 19)
2. 1988 GMC Stepside Pickup Truck — (Count 20)
3. 1989 Honda Goldwing Motorcycle — (Count 21)
4. 1991 Chevrolet Lumina — (Count 22)
5. 1995 Volkswagon Jetta — (Count 23)
6. 1993 Hyundai Excel — (Count 24)
7. 1994 Hyundai Excel — (Count 27)
8. 1994 Cadillac Eldorado — (Count 28)
8. 1994 Ford Probe — (Count 29)
9. 1995 GMC Stepside Pickup Truck — (Count 30)

The Government contends that all 26 of these properties, except for the 1994 Ford Probe, were allegedly bought with the proceeds of illegal drug transactions while the Probe was allegedly used to transport illegal drugs. Several of the properties were allegedly subject to forfeiture either because they were bought with drug proceeds or were used to facilitate drug transactions: (1) 1948 South Martin Luther King Drive; (2) 1955 South 19th Street; (3) 2420 Wembley; (4) the 1988 Honda Goldwing in Count 19; (5) the 1991 Chevrolet Lumina; (6) the 1995 Volkswagen Jetta, and (7) the 1994 Cadillac Eldorado.

The Claimants in this case are relatives and associates of Melvin Logan or his immediate family who claim some interest in the above-listed properties. Specifically, they are Marvin Logan, who is Melvin Logan's father, Prince Ella Logan, who is Melvin Logan's sister, Cleveland Logan and J.B. Logan, both of whom are Melvin Logan's brothers, Shawnika Champion and LaDonna Robinson Champion, both of whom are step-daughters of Melvin Logan, and Rhonda Davis, an associate or friend of Cleveland Logan.

Marvin Logan asserts a claim to the real properties listed in counts 1, 7, 9, 10, 11,

12, 14, 15, 16, and 17, and to the vehicles listed in counts 20, 23, 28 and 30. Prince Ella Logan asserts a claim to the real properties listed in counts 2, 3, 4, 9, 10, 11, 15, 16, and 17, as well as a claim to the vehicle listed in count 22. Cleveland Logan claims an interest in the real property listed in counts 5, 6, 8, and 18, along with a claim to the vehicles listed in counts 19, 21, and 25. Shawnika Champion claims an interest in the 1993 Hyundai Excel listed in count 24. LaDonna Robinson Champion claims an interest in the 1994 Hyundai Excel listed in count 27. Finally, Rhonda Davis asserts a claim to the 1994 Ford Probe in count 29.

The Government seeks forfeiture of these properties pursuant to 21 U.S.C. § 881(a)(7), 21 U.S.C. § 881(a)(4) and 21 U.S.C. § 881(a)(6). Specifically, 21 U.S.C. § 881(a)(7) provides for forfeiture of real property that meets the following conditions:

All real property, including any right, title, and interest ... in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment, except that no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

Similarly, 21 U.S.C. § 881(a)(4) provides that the following types of personal property may be subject to forfeiture:

All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (1), (2), or (9).

The property referred to above is described at 21 U.S.C. § 881(a)(1), (a)(2), and (a)(9) as follows:

(1) All controlled substances which have been manufactured, distributed, dispensed, or acquired in violation of this subchapter.

(2) All raw materials, products, and equipment of any kind which are used, or intended for use, in manufacturing, compounding, processing, delivering, importing, or exporting any controlled substance or listed chemical in violation of this subchapter;

(9) All listed chemicals, all drug manufacturing equipment, all tableting machines, all encapsulating machines, and all gelatin capsules, which have been imported, exported, manufactured, possessed, distributed, dispensed, acquired, or intended to be distributed, dispensed, acquired, imported, or exported, in violation of this subchapter or subchapter II of this chapter.

As can be seen from these code sections, § 881(a)(4) and (a)(7) allow for forfeiture of properties that are used to commit illegal drug transactions. But § 881(a)(6) provides for the forfeiture of the proceeds of drug transactions or property traceable to the proceeds. Most of the properties in question here are alleged to have been bought with the proceeds of Melvin Logan's drug dealing.

Because of the shifting burdens and the somewhat complicated timing of the evidence that is properly considered at the various stages, the Court will state separately its findings of fact and conclusions of law for the probable cause determination and the Claimant's case in chief, combined with the Government's rebuttal.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Because the legal conclusions regarding probable cause impact the evidence that is properly considered, the conclusions of law

will be set out first, followed by the factual findings.

### A. Conclusions of Law

### I. Burdens

■ The burden in a forfeiture case initially is upon the Government to show that probable cause exists to believe that the property in question is subject to forfeiture. *See United States v. All Assets and Equipment of West Side Building Corp.*, 58 F.3d 1181, 1187 (7th Cir.1995). If the Government meets this burden, the "ultimate burden shifts to the claimants to prove by a preponderance of the evidence that the property is not subject to forfeiture." *United States v. All Assets and Equipment of West Side Building Corp.*, 58 F.3d 1181, 1187 (7th Cir.1995).

■ Probable cause is more than mere suspicion and requires that the Government show a "nexus" between the property and illegal drug activity. *See Id.* at 1189, n. 13. This means that the Government must show that it has "reasonable ground for the belief of guilt supported by less than prima facie proof but more than mere suspicion." *United States v. All Assets and Equipment of West Side Building Corp.*, 58 F.3d 1181, 1188 (7th Cir.1995), A nexus is less than a substantial connection and requires that the connection between the drug proceeds or activity and the property be more than merely "incidental or fortuitous." *United States v. 916 Douglas Ave.*, 903 F.2d 490, 493 (7th Cir.1990). Also, hearsay and other circumstantial evidence are properly considered in making

the initial probable cause determination, so long as the evidence bears "strong indicia of reliability." [1]  *See, e.g. United States v. United States Currency Deposited in Account No. 1115000763247 for Active Trade Co.*, 176 F.3d 941, 945 (7th Cir.1999).

### 2. Timing of Evidence Obtained by Government

■ Claimants also argue that the Government is limited to proof obtained prior to the institution of the forfeiture proceeding when attempting to show probable cause for the forfeiture. The Government, on the other hand, agrees that it must have evidence sufficient to establish probable cause at the time forfeiture proceedings are initiated, but argues that it may also supplement with additional proof obtained after the forfeiture has been instituted.

The Circuits are not in accord with regard to whether the Government may rely on evidence obtained after the forfeiture proceeding has begun in demonstrating probable cause. Several Circuits have indicated that the Government's proof is limited to the evidence that it has obtained prior to the institution of the forfeiture proceeding, while other Circuits hold that the Government may rely on evidence obtained after the forfeiture proceeding has been initiated. *Compare United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051 (9th Cir.1994); *United States v. Parcels of Property*, 9 F.3d 1000, 1004 (1st Cir.1993) (probable cause determination made as of time that forfeiture proceeding was instituted); *United States v. $91,960.00*, 897

1. Regarding the hearsay evidence, Cleveland Logan and Prince Ella Logan complain that because the Court limited their objections at trial, they are now hampered in their ability to object to hearsay and so they enter a generalized objection to all hearsay. (Claimants Brief at p. 4). This is not only plainly incorrect but also a very slothful way to attack admissibility. The Court clearly indicated several times during trial that it would allow objections to any evidence at the end of the trial in the closing arguments. It even allowed a continuing objection on the record.

Objections during trial were limited so that the trial could end in some reasonable time.

In addition, since the Claimants had transcripts at their disposal during their preparation of closing arguments, they could sift through it and ponder their objections—a leisure they would not have at trial. So, contrary to the Claimants' whine, the Court's method of allowing objections actually benefitted the Claimants rather than hampered them. They merely failed to take advantage of the opportunity to add specific objections in their closing arguments.

F.2d 1457, 1462 (8th Cir.1990) (holding that district court should consider *only* evidence obtained prior to forfeiture proceeding) with *United States v. Premises and Real Property at 4492 S. Livonia Rd.,* 889 F.2d 1258, 1268 (2d Cir.1989) (holding district court may rely on "after acquired" evidence); *United States v. $67,220.00 in United States Currency,* 957 F.2d 280, 284 (6th Cir.1992) (same, adopting *Livonia*).

In deciding this issue of statutory construction, the actual statutory language must be considered first, and it is quite clear. Specifically, 19 U.S.C. § 1615, which is incorporated by virtue of 21 U.S.C. § 881(d), provides that

> In all suits or actions ... brought for the forfeiture of any vessel, vehicle, aircraft, merchandise ... where the property is claimed by any person, the burden of proof shall lie upon such claimant; and in all suits or actions brought for the recovery of the value of any vessel, vehicle, aircraft, merchandise ... the burden of proof shall be upon the defendant: *Provided, That probable cause shall be first shown for the institution of such suit or action.* (Emphasis added)

The language is clear that probable cause must be shown "for the institution of" the forfeiture proceeding. This is a fairly strong indication that the Government is limited to the evidence that it has obtained up to the point at which the forfeiture proceeding has been instituted. Though the forfeiture provisions are clearly intended to provide an extra weapon in the war on drugs, this plain language also shows Congress's intent that before a claimant is required to go to the considerable trouble and expense of defending against a forfeiture of his home or property, the Government must at least have probable cause to institute the proceedings. This is not an onerous burden.

Surprisingly, the parties in this case spend very little time analyzing the actual language of the statute. For the most part, the parties simply note the circuit split, and then urge the Court to rule in accord with the Circuits favoring their respective positions.

The Government also advances several policy arguments. First, it contends that preventing the use of evidence acquired after the institution of a forfeiture proceeding would lead to "ridiculous results" in that the criminal defendant might plead guilty at some point after the forfeiture proceeding had begun. If so, that plea might be deemed inadmissible to prove probable cause.

This argument, however, ignores the statutory language quoted above. In short, the fact that some very helpful evidence may come to light later is irrelevant to the Government's initial burden to have probable cause at the time the forfeiture proceedings are instituted. If the defendant pleads guilty after the proceedings have begun, the evidence may still be admissible, just not admitted to prove probable cause but instead to rebut or cast doubt on the claimant's prima facie case. None of this changes the fact that the Government simply must have (and demonstrate) probable cause as of the time that it institutes the forfeiture proceedings.

The Government's other policy argument is that there is "no good reason" to keep out additional evidence of probable cause that is obtained after the forfeiture proceedings have begun. It is true that some courts have employed this method of analysis, concluding, at least impliedly, that more is preferable to less in this context. *See Livonia,* 889 F.2d at 1268; *$67,220.00 in U.S. Currency,* 957 F.2d at 284. But it should be noted that the language of the statute says absolutely nothing about the use of evidence obtained after the forfeiture is instituted. District Courts in the Sixth Circuit have correctly criticized the opinion in *$67,000* for its complete failure to analyze the language of the statute it was interpreting. *See Jones v. U.S. Drug Enforcement Admin.,* 819 F.Supp. 698, 715–16 (M.D.Tenn.1993).

Also, since the Government agrees that it must have probable cause to institute the proceedings, there is also no good reason to allow the Government to heap on redundant evidence as part of its probable cause showing. The only effect of the admission of such evidence would be to prejudice the fact-finder against the claimants.

The Court is aware that the Government has a great deal of evidence regarding all the properties, and if the temporal framework were no barrier, probable cause would likely be shown to forfeit all or almost all the properties. But the statutory language is quite clear, and the Government's burden to show probable cause is not a difficult one to meet. Since the Seventh Circuit has not yet taken a position on this issue, the Court will follow the clear statutory language and the persuasive opinions from those Circuits that limit the Government to the evidence it had obtained prior to the institution of the forfeiture proceeding. Thus, the Court will not consider evidence obtained by the Government after the forfeiture complaint was filed in determining the existence of probable cause. The forfeiture complaint in this case was filed on January 22, 1997, so the Court concludes that it will consider only the evidence obtained prior to that date in making the probable cause determination.

The Court's ruling regarding this initial probable cause determination, of course, does not mean that the Government's evidence obtained after the institution of the suit will be ignored for the ultimate determination as to whether the claimants have proved by a preponderance that the properties are not subject to forfeiture.

### B. Factual Findings

With these conclusions of law set out, the Court will turn to its findings of fact regarding probable cause.

The probable cause determination here is slightly complicated by the fact that the properties are not formally owned by Melvin Logan, the person who has pleaded guilty and been sentenced for his drug distribution activities. If all the properties were listed as owned by Melvin Logan, the probable cause determination would be relatively easy since there was a great deal of testimony that he had no legitimate source of income sufficient to explain the level of wealth needed to acquire the property. Here, as described above, the family members who were listed as the owners of the properties were employed and had at least some legitimate sources of income. Thus, more evidence than a mere disparity between Melvin Logan's income and his assets will be required to show probable cause in this case.

The Government points, without specificity, to the evidence that it obtained from Alec Sanders and Ralph Jackson to establish probable cause. Despite the Court's conclusion that the parties would be able to present arguments about the existence of probable cause at the end of the case, the Government seems rather content to rest on the Court's earlier tentative ruling that probable cause had been shown. (See Tr. p. 795 and pp. 1821–1822). This decision has greatly complicated the Court's task, in that the Court must now sift, without assistance from the parties, through the entire voluminous record, and has delayed the resolution of this case.

The Government relied upon David E. Hood, who is an agent with the Federal Bureau of Investigation, and Sue Roderick, an agent with the Internal Revenue Service. Agent Hood testified about an investigation of a conspiracy to distribute cocaine involving the Joiner family in Springfield, Illinois. He also testified that several individual members of the Joiner conspiracy agreed to cooperate with the Government, and that he interviewed these cooperating witnesses as part of his investigation of Melvin Logan. (Tr. 20–22). The statements relayed by Agent Hood came from several witnesses: Brian Kirkham, Michael Brooks, Sheila Dickerson, Herbie Drake, Larry Granderson,

Bruce Green, Raphael Jackson, Annie Joiner, Willie Joiner, Leashawn Logan, Thelma Logan, Debra Poole, Troy Powers, Al–Jo Sanders, Eddie Shannon, and Frank Watts.

However, the interviews of Ms. Dickerson, Mr. Green, Mr. Watts, Mr. Shannon, Ms. Joiner, Mr. Joiner, and Leashawn Logan were conducted after the forfeiture complaint was filed, so the admittedly damning evidence obtained during those interviews will not be considered in making the probable cause determination.

Not surprisingly, the Claimants attack the credibility of the informants and the reliability of the statements on two primary grounds: their statements are hearsay, and the informants are felons, drug dealers, and/or liars. Individually, the threads of hearsay from these informants may be relatively weak, but in their substantial overlap and consistency they make for a strong fabric. Hearsay, of course, is properly admitted, so long as it is reliable. Also, the Court did not expect members of the cloth to testify about the intricacies of Melvin Logan's drug dealing and money laundering operation, and the use of witnesses who are cooperating and have criminal histories is not unusual in this context. The impeachment of these witnesses revealed nothing unusual or out of context. It did, however, reveal that Melvin Logan knew and associated with a lot of people who were engaged in the illegal drug trade.

Thus, the Court does not discount the reliability of all the statements obtained by Agent Hood and Agent Roderick. These statements were consistent with one another, they were supported by the property records obtained by Agent Hood, and corroborated by other statements, such as those from the car salesman who negotiated with Melvin Logan over the purchase of the 1994 Cadillac automobile, and the statements from the manager at Rex Appliances. The specificity of the statements from Al–Jo Sanders and Brian Kirkham also is a factor to consider in assessing their reliability. Those informants indicated to the Government the *specific* real properties that Melvin Logan bought with drug proceeds. This, again, was consistent with the property records obtained by the Government. The Court finds these statements to be reliable.

Though Agent Roderick gave very detailed testimony regarding financial records of the Claimants, it is clear that many of these records, if not all of them, were obtained after the complaint was filed, so they will not be considered in making the probable cause determination. The Government did not specifically note when Agent Roderick obtained the records.

This lacuna in the Government's proof is even more surprising considering the fact that Counsel for Claimant Cleveland Logan and Counsel for Marvin Logan explicitly inquired on cross-examination as to the date by which Agent Roderick had obtained the financial information. (See Tr. pp. 552–556, and pp. 688–689). This cross-examination did reveal that Agent Roderick had deeds from county records and a credit report at her disposal prior to January 22, 1997. (Tr. 553). In addition, Agent Roderick testified that she relied on several interviews that were conducted prior to January 22, 1997, including interviews of Willie Joiner, Annie Joiner, and Al–Jo Sanders with respect to Cleveland Logan. (*Id.*). The Government, on redirect examination, did not attempt to show when Agent Roderick had obtained the information about the properties in question or the financial information about the Claimants. (*See* Tr. pp. 743 ff.).

Having determined that the Court may properly rely on the evidence and the statements that were obtained by Agents Hood and Roderick prior to the filing of the complaint in this case, the Court makes the following findings of fact regarding probable cause:

> (1) Melvin Logan was involved in the distribution of drugs from the early 1980s to at least the mid 1990s.

(2) Melvin Logan had no source of legitimate income, so he needed a method to launder the money accumulated by his drug selling.

(3) His method of laundering the money was to buy properties in other family members' names, especially those of his father and sister, but also in his brothers' names.

(4) These real properties were generally located on the east side of Springfield, Illinois, and many properties were specifically located on East Cedar.

(5) Property records in fact showed that many properties titled in the names of Logan family members were located on the east side of Springfield, Illinois.

(6) Specific real properties were bought with the proceeds of Melvin Logan's drug business, as indicated by the informants.

(7) All the properties, except the property at 1948 Martin Luther King, were bought during the same time period that Melvin Logan was making a great deal of money selling drugs, and he needed a method to hide the illegal income.

(8) A large and unusual amount of cash was usually involved in these purchases, while prior to and after this period of time (early 1980s to mid 1990s) property accumulation by the Logan family was practically nonexistent, and, when property was purchased outside this time, it did not involve unusually large amounts of cash.

(9) Melvin Logan would sign receipts in his father's name for appliances used in the houses ostensibly owned by other family members.

(10) Melvin Logan and his family lived in the residence at 2420 Wembley.

(11) Unlike the case with the real properties, most (but not all) of the witnesses' statements and evidence about the vehicles was obtained *after* the forfeiture complaint was filed.

(12) But Melvin Logan did negotiate the purchase of the 1994 Cadillac.

(13) Also, Melvin Logan bought two Hyundai automobiles for Shawnika Champion and LaDonna Robinson Champion with drug proceeds.

(14) The other vehicles were not connected to drug proceeds with any additional evidence that the Government obtained prior to the filing of the forfeiture complaint.

(15) Unlike the other real properties involved in this case, the property at 1948 Martin Luther King was purchased in 1971, which is long before the time that Melvin Logan was dealing drugs or conspiring to deal drugs.

(16) The only evidence obtained prior to the filing of the complaint in this case that connects the property at 1948 Martin Luther King to drug proceeds is one statement from Willie Joiner that Melvin Logan had used $25,000 to remodel and refurbish this house, which is Marvin Logan's primary residence.

(17) Unlike the statements regarding the other real properties, there is no corroborating evidence (that pre-dates the filing of the complaint) of Willie Joiner's testimony about Melvin Logan's use of the $25,000 and no time period is specified regarding the use of the money.[2]

(18) No evidence that was obtained prior to the filing of the complaint has been presented regarding the following vehicles: a 1988 GMC Stepside Pickup Truck (Count 20), a 1988 and a 1989 Honda Goldwing Motorcyle (Counts 19 and 21, respectively), a 1991 Chevrolet Lumina (Count 22), a 1995 Volkswagon Jetta (Count 23), a 1994 Ford Probe (Count 29), and a 1995 GMC Pickup (Count 30).[3]

## C.  Conclusion Regarding Probable Cause

■ The probable cause determination in this case would have been much easier if the Government had specifically laid out the dates on which it had obtained its

---

**2.** The Court notes that there was evidence that Marvin Logan obtained a $10,000 loan to assist Melvin Logan's reentry into the drug trade. But this evidence was not obtained prior to the filing of the action in this case and will not be considered at this stage.

**3.** Again, the Court notes that the financial information relied on by Agent Roderick is quite damning, but it appears to have been obtained after the forfeiture complaint was filed.

information. Ironically, in many instances, the Claimants' attorneys themselves demanded specific dates by which Agent Hood and Agent Roderick had obtained their information from informants or other sources. Without the Claimants' attorneys' assistance, the probable cause determination would have been much more difficult, given the Court's ruling that the Government must have obtained its evidence of probable cause prior to the institution of the proceedings.

The Court has not found evidence obtained prior to filing of the complaint that connects many of the vehicles to drug proceeds, though there is plenty of such evidence that Agent Roderick obtained after the institution of these proceedings. Thus, the only evidence properly considered by the Court was the fact that Melvin Logan bought real property with drug proceeds during the 1980s and 1990s and put them in other family members' names. But the fact that Melvin Logan titled *real property* in family members' names, by itself, is insufficient to constitute probable cause to believe that any particular *vehicles,* such as the ones listed in finding of fact number 18, were also bought with drug proceeds.

In sum, based on the above analysis, the Court finds that the Government has demonstrated probable cause for the forfeiture of the eighteen (18) properties listed in the following counts: 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, 17, 18, 24, 27, and 28. Probable cause has not been shown (as of the time the forfeiture complaint was filed) for the forfeiture of the eight (8) properties in counts 1, 19, 20, 21, 22, 23, 29, and 30. Thus, these eight properties will not be ordered forfeited to the United States.

### III. CLAIMANTS' PRIMA FACIE CASE AND REBUTTAL

As to the 18 properties for which probable cause to forfeit has been shown, the burden now shifts to the Claimants to show by a preponderance that the properties are not subject to forfeiture. The hearsay evidence is not properly consid-

ered in making this determination, and the Government's evidence is no longer limited to the evidence it obtained prior to the institution of the forfeiture. The Court has considered the testimony presented during the Claimants' case in chief and the Government's rebuttal.

The Claimants' attempt to meet their burden was seriously impaired by at least two factors: their stories were often simply inconsistent or implausible, thus seriously impairing their credibility, and they failed to submit any documentary evidence to support their self-serving testimony. For example, Prince Ella Logan testified that she used $3,000 in insurance proceeds to assist in the purchase of the properties at 1820 Spruce, 2237 East Cedar, and 2240 East Cedar. She later filed a "correction" of her testimony to indicate that the insurance proceeds were not paid to her until *after* those properties were purchased. In other words, it appears to the Court that Prince Ella Logan's testimony was, at best, simply false, and at worst, an outright lie.

Marvin Logan's testimony also was inconsistent and implausible, to say the least. He testified that he did not trust banks and he saved money at home in various containers, such as his socks. But he had accounts at several local banks. Also, he did not keep run of the mill pocket change in these various containers, but instead purportedly deposited tens of thousands of dollars in cash into them, though no such cash was found in the search of his property and home. He even testified that he had no idea how much he put in his socks, nor did he have any idea how much was left after he removed, say, $10,000 from them. Yet he did not use the "socks" in 1979 to buy the Monroe Street property. He also did not use the socks in 1993 when he got a $10,000 loan secured by his primary residence. The socks are a convenient all-purpose explanation, and Marvin Logan never adequately explained the inconsistencies in his testimony.

Further, Marvin Logan, who purports to own many of these properties, owned only one property other than his primary residence prior to the 1980s, when Melvin Logan's drug dealing began. This property, located at 2017 Monroe, was bought in 1979, with a mortgage. But many of the properties that were subsequently acquired were often bought with a large amount of cash or paid off with unusually large cash payments. The large cash payments coincided with the time period in which Melvin Logan was dealing drugs. All of these inconsistencies and implausibilities, along with his general evasiveness under questioning, render his testimony not very credible.

Cleveland Logan usually attempted to explain inconsistencies by blaming his accountant, an all-purpose explanation that the Court finds more than a little suspicious. Also, Cleveland Logan failed to explain such inconsistencies as his placing of real property in his sister's name purportedly to keep it from his wife, but a short time thereafter placing real property in his own name. He also failed to present any documentation of his accountant's alleged errors, and, in fact, no accountant or other expert was called to bolster his contention about his accountant's alleged mountain of errors.

Franklin Watts was no model of consistency either, due to the additional details he added to his statements over time. But the Court does not discredit his testimony simply because he may have not been completely forthcoming on an earlier occasion due to fear of retribution by Melvin Logan or prosecution by the Government. This is a familiar scenario when drug dealers and their confederates face prosecution. In addition, the fact that he added details about his dealings and conversations with Melvin Logan (which took place over a period of approximately 10 years) during his trial testimony does not impair his credibility as, for instance, the seemingly rehearsed testimony of the Claimants impairs their credibility.

The Court was basically faced with conflicting statements by the Claimants, on the one hand, and Frank Watts, on the other. In determining the source of the money used to purchase these properties, therefore, the Court must determine whether the other evidence supports one version of the truth over another.

The Court finds that Frank Watts' testimony is supported by other evidence in the record. This evidence includes the deeds obtained by the Agents, the plea agreement entered into by Melvin Logan, the general (though not complete) consistency of his statements about Melvin Logan's activities over time, and the huge volume of financial records obtained and used by the Government. This evidence was woven into a plausible account of the origin of the money used to buy the properties.

On the other hand, the testimony of the Claimants was not very credible because it lacked so little corroboration or support. It seemed to the Court that every time the Claimants had to explain where the money to purchase one of these properties came from, they resorted to a murky world of socks and cans stuffed with cash, though no such cash was found during any searches. Again, though they used banks and seemed unafraid of the banking system in general—having obtained mortgages previously and using banks for savings accounts—they also testified that they did not trust banks and preferred to deposit money into socks. When confronted with inconsistencies, other people were blamed, such as Cleveland Logan's accountant.

Perhaps more surprising was the failure to corroborate any of their purported horde of cash with a detailed analysis of income and spending over the years. A person facing a forfeiture of their property might be expected to make at least some decent stab at showing a plausible ability to save the many thousands of dollars that the Claimants testified they saved despite their modest incomes. Surprisingly, no such attempt was made.

In general, the Claimants appeared to be trying to create a story that was just incredible, implausible and inconsistent. The Court therefore credits Franklin Watts' testimony, despite the flaws, and finds him to be more credible than the Claimants. His testimony will be given greater weight than the Claimants' testimony.

Rather than listing the detailed findings of fact here, only to repeat them in the discussion of the individual properties, the Court will incorporate the factual findings into the following discussion of the specific properties.

1. *2037, 2041 and 2045 East Cedar— Counts 2, 3, and 4.*

Prince Ella Logan claims an interest in these three properties, which comprise one house on 3 adjoining lots. They were purchased in 1988 for a total of $10,500, which was paid in cash. (Exh. 2B). Ms. Logan stated that she contributed $500 toward the purchase price and that her father, Marvin, contributed the remaining $10,000. She did not know the name of the person who sold the property to her. The rental income and tax deductions were claimed by Marvin Logan as well. Ms. Logan had a bank account that she used, but the money apparently did not come from any such account.

Marvin Logan faced a slight difficulty in showing where the $10,000 came from to buy this property. He could not remember whether the $10,000 came from one of his "socks" at home where he supposedly kept so much cash that he could not recall how much money was in the socks or how much was left after the $10,000 was removed for the purchase. He even testified that there was still money in the socks at the time of trial, though no such cash was found during the search of the property.

In addition to this testimony, the evidence showed that Prince Ella Logan earned approximately $23,000 per year yet used a good deal of her own cash to buy a $10,000 house and adjoining lots for the purpose of growing a garden. She did not know where her father got the money. She was surprisingly unaware of details surrounding the transaction.

Further, Frank Watts testified that Melvin Logan told him that he was going to buy the properties. Frank Watts never saw Ms. Logan at the houses when he was there with Melvin Logan.

The Court finds that the explanations offered by Ms. Logan regarding the source of the money used to purchase these properties are not plausible or credible. The Court also finds the explanation that the $10,000 cash came from a sock or socks stuffed with apparently inexhaustible hordes of cash maintained by Marvin Logan to be incredible. Based on these factual findings, the Court concludes that Prince Ella Logan has failed to show by a preponderance of the evidence that these properties are not subject to forfeiture.

2. *1955 South 19th Street—Count 6*

This property was purchased in 1989 and titled in the name of Prince Ella Logan. The total price was $19,000, and Ms. Logan testified that she paid $1,000 as a down payment. The remainder came from a $14,000 loan and cash of $4,350.42. In 1990, Cleveland Logan and Prince Ella Logan entered into a contract for deed to purchase the property for $21,000. He paid $2,000 down and the rest of the purchase price was to be paid over 15 years. Cleveland Logan received the title to the property in 1995. He obtained a $23,800.00 mortgage on the property, which was used in part to pay off Prince Ella's mortgage on the property. He received the other $12,405.00 and deposited it in his checking account.

Cleveland Logan testified that he was the original purchaser of this property, although it was titled in his sister's name, so that he could shield it from his ex-wife. But he had no similar reservations about titling a property in his name only a short time later. He testified that the money

came from savings that he had acquired through work and going to college. (Tr. 886). But he attended college in the early 1970s. That would be quite a long wait for the right investment opportunity.

On cross examination, Cleveland Logan was asked about the source of the funds used to make mortgage payments for the loans on the property, because it appeared that the rental income declared on his tax returns was insufficient to pay the mortgage. This discrepancy, like several others where his testimony was not consistent, was blamed on his accountant. (Tr. 970).

Frank Watts testified that this property was originally purchased by Melvin Logan with drug proceeds, and was later given to Cleveland Logan by Melvin Logan as payment for Cleveland Logan's assistance in Melvin Logan's illegal drug distribution business.

The Court finds Cleveland Logan's explanation for the source of funds used to purchase this property is not credible. His testimony was not consistent, and every time a discrepancy between his assertions and other facts (like his tax returns) was pointed out, someone else (such as his accountant) was blamed.

Based on these factual findings, the Court concludes that Claimant Cleveland Logan has failed to show by a preponderance of the evidence that the property at 1955 South 19th Street is not subject to forfeiture.

### 3. Count 7: 1209 East Laurel

This property includes the barber shop that was operated by Melvin Logan. It was purchased in Marvin Logan's name in 1989 for $25,000, including a $10,000 loan and $500 down.

Marvin Logan testified that this property was purchased for his son, Melvin, so that he could run the barber shop. Marvin Logan originally indicated that the money used to purchase the property came from his bank account. (Tr. 1200). On cross examination, however, Marvin Logan again resorted to the bottomless socks as the source of the money used to purchase this property. (Tr. 1266). This use of the socks comes only about one year after $10,000 had purportedly been removed from them to give to Prince Ella Logan for the purchase of the three lots with a garden.

In addition, the source of the money that was used to pay the $10,000 mortgage is not at all clear. The mortgage was paid off in only two years. Further, Frank Watts testified that Melvin Logan purchased the property and titled it in his father's name. (Tr. 1488).

The Court finds that Marvin Logan's explanation for the source of these funds is simply incredible. He did not merely add details, but directly contradicted himself during cross examination on the source of the funds.

Based on these factual findings, the Court concludes that Claimant Marvin Logan has failed to show by a preponderance of the evidence that the property at 1955 South 19th Street is not subject to forfeiture.

### 4. Count 8—2038 South Grand Avenue

This property was bought in the name of Cleveland Logan in 1989 for $26,650. The payment was made with two cashiers checks.

J.B. Logan testified that he had originally intended to buy this property, but suddenly simply changed his mind and talked to his brother, Cleveland, about buying it instead. He testified that he loaned the purchase money to Cleveland, and that the source of the loan proceeds was a settlement of an insurance claim arising out of a motorcycle accident.

During a deposition in this case, however, the following took place:

Question: Have you ever given money to Cleveland Logan?
Answer: Yes

Question: How much? When did you give him money?

Answer: It has never been over a hundred dollars to—not give, loan, never over $100 dollars.

Question: Okay. And when—approximately when was that?

Answer: It has been maybe $100 two or three years ago.

Apparently, J.B. Logan suddenly remembered at trial that his earlier deposition testimony was incorrect and that he had in fact given his brother over $26,000. The Court finds J.B. Logan's testimony is not credible on this point and gives it very little weight.

J.B. Logan also testified that he put the money from the motorcycle accident settlement in his bank account and then withdrew it about a month later. But no documentation, either from the insurance company or the bank, was presented to substantiate this point.

In sum, the Court finds that the facts in the record support the conclusion that Claimant Cleveland Logan has failed to show by a preponderance of the evidence that this property is not subject to forfeiture.

### 5. Counts 9, 10, and 11—2246, 2248 and 2250 East Cedar

These properties were bought in August, 1988 for a total of $55,000 and titled in Marvin and Prince Ella Logan's names. Prince Ella Logan initially indicated that she contributed some of the money used to purchase the property, though she could not specify how much. Later, during her cross examination, however, she testified that she contributed no money toward the purchase of these properties and that her grandmother had bought them.

Marvin Logan also testified that these properties were bought with money from a can that his mother-in-law put money into and in which she had apparently accumulated $55,000. He testified that his mother-in-law wanted the properties for her grandchildren and that they were put in his name and Prince Ella Logan's name so that a possible second wife couldn't obtain the property at some point in the future.

No explanation was offered for this odd arrangement, other than a general fear of banks, and Prince Ella Logan directly contradicted herself about whether she contributed any funds to buy these properties.

In fact, in his closing argument on this point, Claimant Marvin Logan is content to continue to advance an irrelevant attack on the sufficiency of the Complaint, rather than pointing to evidence showing the source of the funds used to buy these properties. Claimant Prince Ella Logan attacks the Government's evidence, but points to absolutely no evidence showing any legitimate source of the funds used to buy these properties.

Based on the facts presented at trial, the Court finds that Claimants Marvin and Prince Ella Logan have failed to meet their burden to show that these properties are not subject to forfeiture.

### 6. Count 12—2420 Wembley

This property was purchased in Marvin Logan's name for a total of approximately $93,000 in December, 1991. A down payment of $19,189.57 was made at closing and the balance was paid with a mortgage loan in the amount of $74,400.

In 1996, this property was refinanced, and two cashier's checks in the amount of $30,000 were paid as part of this transaction. These cashier's checks were traced by Agent Roderick. They were drawn on Marvin Logan's bank account some time after large deposits were made to his account. In addition, Marvin Logan indicated that some of the money for the refinancing came from money he had at home. Marvin Logan indicated that he did not trust banks, yet he maintained several accounts at local banks. (Tr. 1282–1283).

Frank Watts testified that this property was purchased with drug money. (Tr. 1500). Watts testified that Melvin Logan had driven him to this property and dis-

cussed details of financing the purchase. (Tr. 1502).

Also, Melvin Logan admitted in his plea agreement that he used $3,000 of drug money to refinance the property.

Based on the facts as found above, the Court concludes that Claimants Prince Ella Logan and Marvin Logan have failed to show by a preponderance of the evidence that these properties are not subject to forfeiture.

### 7. *Count 14: 1825 South Martin Luther King Drive*

Marvin Logan continued his ostensible real estate acquisitions in 1994 by allegedly purchasing the property at 1825 South Martin Luther King Drive for $22,000. A loan was obtained in the amount of $17,600.

One month after the loan was obtained, a deposit in the amount of $17,000 was made to Marvin Logan's savings account. Of course, this use of the bank account belies Marvin Logan's claim that he did not trust banks. Also, he does not explain why this cash was not also kept in his preferred depository—his socks. Further, if the loan proceeds were not the source of the cash deposit, then the true source is unaccounted for. On the other hand, if it is the loan proceeds that were redeposited, then the source of the funds used to buy the property are not accounted for.

Amazingly, Marvin Logan notes that the source of the funds used to buy this property are something of a mystery. (Marvin Logan Brief at p. 12). In this regard, Claimant seems to be laboring under the misconception that the Government has the burden of proof to show the source of these funds. Of course, that is not the case, and it is Claimant's burden to show by a preponderance that this property was not bought, at least in part, with drug money. Based on the facts analyzed above, he has failed to make this showing as to this property.

### 8. *Counts 15, 16 and 17*

These parcels were bought on May 1, 1995, for $50,000, which included a $1,000 down payment and a mortgage loan for the remainder. They were bought in the names of Prince Ella Logan and Marvin Logan.

Claimant again mentions no evidence regarding the source of the money used to purchase the properties, and instead attacks yet again the sufficiency of the allegations in the complaint. This has become Claimant's favorite argument in this case, despite the Court's repeated denials of motions based on it. Not only is this attack on the pleadings irrelevant at this stage of the proceedings, but also the amended complaint clearly alleges that this property was bought with drug proceeds. Claimant's assertions regarding the sufficiency of the complaint are merely a distraction and do not suffice to show that this property is not subject to forfeiture.

The purchase price was paid with three cashier's checks drawn on local banks. The rather large and unusual deposits to the account prior to these withdrawals, however, have not been explained. In 1994, more than $45,000 was deposited to Marvin Logan's savings account, while in 1992 and 1993, respectively, approximately $6,000 and $1,000 was deposited to the savings account. (Exhibit 43). There was no explanation regarding these rather unusually large deposits in 1994 and 1995, when Melvin Logan was increasing his drug profits by selling crack cocaine in the Springfield area.

Prince Ella Logan testified that her contributions to the purchase of this property included $3,000 from a settlement of an automobile accident. The problem with this testimony, however, is that she did not receive the $3,000 until after the properties had been purchased. The parties filed a stipulated correction of this testimony, agreeing to the fact that Prince Ella Logan's testimony was false.

In addition, Prince Ella Logan testified that she deposited the money constituting

her contribution toward this purchase into the bank despite the fact that she already had the money at home. It seems odd to deposit this money into the bank only to withdraw it a short time thereafter.

Frank Watts testified that the properties were purchased by Melvin Logan using drug money. Watts testified that Melvin Logan told him that he was going to title the properties in his father's and sister's names. (Tr. 1510).

Though the Government points to statements by Norma Burt and Larry Burt indicating that Melvin Logan was interested in this property, their statements are hearsay and no exception has been identified that would allow these statements to be admitted.

But those statements are not necessary. The Court finds that the explanations offered by Marvin and Prince Ella Logan are implausible, and, in some cases, simply contradictory. In light of these facts, the Curt concludes that the Claimants have failed to show that these properties are not subject to forfeiture.

### 9. Count 18—1004 South 13th Street

This property was conveyed by Frank Watts to Cleveland Logan in 1996 for $2,500.

Frank Watts testified that this house was given to him as payment for his assistance to Melvin Logan in his illegal drug distribution activities. He testified that he was present when this property was purchased at auction. Melvin Logan instructed Watts to put the house in his grandmother's name to avoid losing it if he got caught selling drugs. Watts was told to sell the house to one of the Logan family if he wanted to sell it at a later date.

All of this testimony is in fact consistent with the other evidence, showing that the house was in fact bought at an auction and that it was titled in Watt's grandmother's name, and was later sold to a member of the Logan family, specifically Cleveland Logan.

The low selling price could be understood in either of at least two ways. It could be that the house was simply in poor condition, as testified to by Cleveland Logan, and needed a good deal of repair work. Or, perhaps the low selling price reflected the fact that Watts was a confederate of Melvin Logan and was already receiving a large amount of cash "under the table" in connection with the sale of the house and the other $2,500 shown as the sale price was a discounted price constituting a payment to Cleveland Logan for his assistance in Melvin Logan's drug distribution activities. It is the latter interpretation, in fact, that is borne out by the evidence before the Court.

Watts testified that he eventually did ask Melvin Logan to buy the house back, and to do so he advised Watts that he would give him $9,000 for the house and would have Cleveland Logan install siding on Watt's house on Griffiths Street. In addition, Watts testified that Melvin Logan was going to buy the house for Cleveland as payment for his help in selling drugs.

Cleveland Logan testified, contrary to the testimony of Watts, that his purchase of the property was an arms' length transaction, whereby he agreed to pay $2,500, plus install siding on Watts' house. Cleveland Logan also indicated that he planned to make repairs to the house, costing approximately $8,000. (Tr. 1003–1004). Thus, the total expenditures by Cleveland Logan for this property would add up to more than $19,000. But Cleveland Logan testified that the property would be worth $15,000 at the most. (Tr. 1007). In addition, Cleveland Logan testified that the only repair he needed to make to the house was the installation of a new furnace and that the house was already rented when he bought it. This belies his testimony about the need for extensive repairs. Cleveland Logan was not very credible on this point.

Based on all these facts, the Court concludes that the Claimant has failed to pres-

ent credible evidence to show that this property is not subject to forfeiture.

### 10. Count 24—1993 Hyundai Excel

This vehicle was purchased in 1993 for $9,062 and titled in the name of Shawnika Champion. The price was paid in full at the time of purchase.

Shawnika Champion testified that the money to purchase the car came from her savings and that her step-father, Melvin Logan, had nothing to do with the purchase. But she also indicated that some of the money had come from an insurance settlement to buy the car. (Tr. 484–485). No documentation of these proceeds was presented.

Frank Watts testified that this vehicle was purchased for his daughter as a high school graduation gift and that he had gone with Melvin Logan to examine the vehicle prior to purchase.

The weight of the evidence indicates that this vehicle was bought by Melvin Logan with drug proceeds. Claimant Shawnika Champion has failed to show that this property is not subject to forfeiture.

### 11. Count 27—1994 Hyundai Excel

This car was bought in 1994 for $10,-589.63 and titled in the name of LaDonna Robinson Champion around the time of her high school graduation. The price was paid in full at the time of purchase, with three cashier's checks.

Ms. Robinson testified that the money came from three sources: a tax refund of $2,500, and the balance from savings she had accumulated. No documentation was presented to support these sources. She failed to explain why she had only purchased one of the cashier's checks herself.

Frank Watts testified that Melvin Logan told him that he was buying the car for Ms. Robinson as a graduation present. Mr. Watts in turn obtained the assistance of his wife, Ruth Watts, to purchase the cashier's checks. The purchase of this cashier's check is substantiated in the record. (Exh. 17C).

The Court finds Ms. Robinson's testimony is unsubstantiated and lacking in credibility. The Court thus concludes, based on the factual findings contained herein, that she has failed to show that this vehicle is not subject to forfeiture.

### 12. Count 28—1994 Cadillac Eldorado

This vehicle was purchased in 1994 for $35,144.75 and titled in Marvin Logan's name. As with so many of the other purchases in this case, it was made with several cashier's checks and cash. Frank Watts testified that the source of the funds for this purchase was Melvin Logan's drug money and that Melvin simply had his father sign the paperwork for the purchase of the vehicle.

In Claimant's closing argument, he points to no evidence showing that this vehicle was purchased with anything other than Melvin Logan's drug money. Given the several purchases of large denomination cashier's checks, some documentation of the source for this money, other than the incredible socks, should have been forthcoming.

Based on the facts in the record, the Court concludes that Claimant has failed to meet his burden to show that this vehicle is not subject to forfeiture.

## IV. PROPORTIONALITY

Claimants raise the issue of proportionality, but it is rather undeveloped and appears to almost be an afterthought. Nonetheless, the Court will consider it.

■ A civil forfeiture must constitute punishment in order for the Excessive Fines Clause of the Eighth Amendment to be applicable. *See Austin v. United States*, 509 U.S. 602, 619, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (forfeitures under 21 U.S.C. § 881(a)(4) and (a)(7) are, at least in part, punishment because they

provide for an "innocent owner" defense and they focus on the culpability of owner).

■ The Seventh Circuit has held that forfeitures under 21 U.S.C. § 881(a)(6), unlike forfeitures sought pursuant to 21 U.S.C. § 881(a)(4) or § 881(a)(7) are not "punishment" because forfeitures under § 881(a)(6) serve the remedial purpose of reimbursing the Government and society for the costs associated with the illegal activity rather than a punitive purpose. *See Smith v. United States*, 76 F.3d 879, 883–84 (7th Cir.1996). That is, forfeitures under the proceeds theory are never disproportionate because the proceeds of drug transactions will necessarily bear a reasonable relationship to loss caused by the drug transactions. *Id.*

Subsequent to the decision in *Smith*, the United States Supreme Court decided *United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), which was a criminal forfeiture case in which the Government sought to forfeit $357,144 because the owner of the cash failed to report the currency he was carrying. Because the only violation was the failure to report, for which the maximum Guidelines sentence was 6 months and a fine of $5,000, and the only harm to the Government was the deprivation of the knowledge that the Defendant was transporting the currency, the Court found that the forfeiture of the entire $357,144 violated the Excessive Fines Clause of the Eighth Amendment of the United States Constitution. *Bajakajian*, 524 U.S. at 337, 118 S.Ct. 2028. The Court articulated several factors that should be considered in arriving at the conclusion that the forfeiture met the "grossly disproportionate" that it applied to the forfeiture: whether the violation is related to other criminal activity, the other penalties applicable as measured by the punishment imposed under the Sentencing Guidelines, and the extent of the harm caused.

It is unclear whether *Bajakajian* applies to civil forfeitures such as the one involved in the *Smith* case, but even if it did its

approach is congruent with the approach set out in *Smith*. Both cases focus not on formal labels but on a functional analysis of whether a given forfeiture provision serves to punish or deter or both. If the provision serves at least in part to punish, then the Eighth Amendment applies and requires that the forfeiture not be "grossly disproportionate" to the offense. Here, the basis for forfeiture of the remaining properties is 21 U.S.C. § 881(a)(6), so it would appear that the Eighth Amendment does not even apply to the properties that remain subject to forfeiture in this case.

But even if the Eighth Amendment did apply here, the forfeitures in this case are not grossly disproportionate to the offense. The use of the properties was closely tied to Melvin Logan's drug dealing in that the properties were the very means by which he laundered the large amounts of cash accumulated by selling drugs over a decade. Thus, these properties played a critical role in allowing the criminal activity engaged in by Melvin Logan and his confederates to flourish. The penalty received by Melvin Logan was 30 years imprisonment. The harm caused by his activities was immense, as he was dealing drugs in the Springfield, Illinois area for a decade. Also, the weight of the evidence presented at trial shows that the Claimants at the very least had possibly very strong suspicions that Melvin Logan was involved in drug dealing since he had no legitimate source of income. There was also evidence that Cleveland Logan assisted his brother Melvin in the drug dealing operation. The Court finds that the forfeitures in question did not violate the Eighth Amendment.

## V. INNOCENT OWNER DEFENSE

Claimants also assert an innocent owner defense, but they base it entirely upon their own self-serving and often implausible testimony and the Court places little weight on their testimony due to their lack of credibility. Not surprisingly, the Claim-

ants in this case denied that they knew that Melvin Logan was a drug dealer, and each Claimant denied that involvement with any drug distribution or drug activity. There is a split among the Circuits regarding whether a Claimant who knows of drug activity, but does not consent, may nonetheless assert an innocent owner defense. *See United States v. 7326 Highway 45 North*, 965 F.2d 311, 315 (7th Cir.1992) (citations omitted) (noting the split, but not taking a position).

But the Court need not take a position on this question because the Claimants cannot plausibly be said to lack actual knowledge of the drug dealing activities of Melvin Logan. Here, the Claimants certainly knew that Melvin Logan had no legitimate source of income. Marvin Logan even explicitly acknowledged that Melvin Logan did not run the barber shop that Marvin Logan himself allegedly bought for him. Cleveland Logan was also quite cavalier about his lack of knowledge; he indicated that he had heard that his brother Melvin Logan was dealing drugs and that the Joiners were dealing drugs and that his brother was "hanging around" the Joiners. (Tr. 934–935). Cleveland Logan's response, when confronted with this knowledge was "you know, to each his own." (Tr. 935). Apparently, Cleveland Logan was not surprised or concerned about Melvin Logan's association and involvement with the illegal drug trade. Perhaps even more surprising was Cleveland Logan's lack of knowledge about any specific instances or number of times that he had discussed his brother's drug dealing activities. (Tr. 936). It might be expected that discussion of illegal activities of this sort would leave some impression.

■ The very best that the Claimants could claim is that they were willfully blind to Melvin Logan's illegal activities and the source of Melvin Logan's income. The Claimants knew that Melvin had no real source of legitimate income and that he nonetheless had money and possessions belying this purported lack of income. A Claimant who is willfully blind to the fact that property is bought with obvious drug proceeds cannot, in any rational sense, be said to lack knowledge of the fact that the source of the money is drug proceeds. The Court finds that the Claimants have failed to show that they are entitled to the innocent owner defense.

## VI. FORFEITED PROPERTIES

Based on the above findings of fact and conclusions of law, the Court will order that the following properties are forfeited to the United States:

(19) 2037 East Cedar, Springfield, IL—Count 2

(20) 2041 East Cedar, Springfield, IL—Count 3

(21) 2045 East Cedar—Springfield, IL—Count 4

(22) 1955 South 19th Street—Springfield, IL—Count 6

(23) 1209 East Laurel, Springfield, IL—Count 7

(24) 2038 South Grand Ave. East, Springfield, IL—Count 8

(25) 2246 East Cedar, Springfield, IL—Count 9

(26) 2248 East Cedar, Springfield, IL—Count 10

(27) 2250 East Cedar, Springfield, IL—Count 11

(28) 2420 Wembley, Springfield, IL—Count 12

(29) 1825 South Martin Luther King, Springfield, IL—Count 14

(30) 1820 Spruce, Springfield, IL—Count 15

(31) 2237 East Cedar, Springfield, IL—Count 16

(32) 2240 East Cedar, Springfield, IL—Count 17

(33) 1004 South 13th Street, Springfield, IL—Count 18

(34) 1993 Hyundai Excel, V.I.N. # KMHVD12J1PU253428 — Count 24

(35) 1994 Hyundai Excel, V.I.N. # KMHVD12J4RU269996 Count 27

(36) 1994 Cadillac Eldorado, V.I.N. # 1G6EL12Y4RU601376 — Count 28

*Ergo,* for the reasons given above, the 18 properties in counts 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, 17, 18, 24, 27, and 28 of

the amended complaint are ORDERED forfeited to the United States. All right, title, and interest in these properties is forfeited to the United States. The remaining eight properties, as explained above, are not forfeited to the United States.